**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MONEY TREE CAPITAL FUNDING, LLC,<br><br>*Plaintiff*,<br><br>-*against*-<br><br>MONEY TREE CAPITAL MARKETS LLC, a New York limited liability company, MONEY TREE CAPITAL MARKETS LLC, a Delaware limited liability company, KAMAL MALIK, EASTONE EQUITIES LLC, ANTHONY LEE, KEVIN YU, FANGZHOU WU, and GLOBAL BANK,<br><br>*Defendants*. | Case No.: _____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Money Tree Capital Funding, LLC ("Lender"), for its Complaint against Defendants Money Tree Capital Markets LLC, a New York limited liability company ("MTCM-NY"), Money Tree Capital Markets LLC, a Delaware limited liability company ("MTCM-Del," and together with MTCM-NY, "Borrower"), Kamal Malik, Eastone Equities LLC ("Eastone Equities"), Anthony Lee, Kevin Yu, Fangzhou Wu, and Global Bank, alleges as follows:

**NATURE OF THE ACTION**

1.      This is a suit by Lender to recover $10,919,178.39 in unpaid principal (and interest) that Lender loaned to Borrower.

2.      Borrower is in the business of originating, making, and servicing mortgage loans to home buyers who buy those homes for investment purposes ("Mortgage Loans"). Borrower then sells these Mortgage Loans to institutional buyers. This business is referred to in this Complaint as the "Primary Loan Business."

3.     Borrower, through affiliated entities, is also in the business of acting as an intermediary in the acquisition, pooling, and sale of mortgage loans to institutional buyers. This business is referred to in this Complaint as the "Secondary-Market Loan Business."

4.     In the summer of 2020, Lender agreed to provide Borrower with a "warehouse" line of credit (also known as a warehouse "funding facility")—which is a line of credit given to a party, like Borrower, that originates loans to others. Borrower would then use this line of credit to fund the Mortgage Loans that it would make in its Primary Loan Business. In exchange, Borrower agreed to pay monthly interest at an annual rate of 14%, calculated on the total amount of credit available under the credit line—which ranged from $2.0 million to $30 million—at any given time.

5.     As explained below, before making any Mortgage Loan, Borrower would purportedly "pre-sell" each Mortgage Loan to an institutional buyer—such as Morgan Stanley Mortgage Capital Holdings LLC, Verus Mortgage Capital, Annaly Capital Management, Inc., Soros Mortgage Capital, and others—and would close on the sale of the Mortgage Loan to an institutional buyer generally within 30 to 45 days after originating the Mortgage Loan. Borrower would then repay the principal that it borrowed from Lender for each Mortgage Loan upon the sale of each Mortgage Loan to the institutional buyer.

6.     Indeed, under the parties' agreement, Borrower was required to repay the principal it borrowed from Lender immediately upon the sale of a Mortgage Loan to an institutional buyer, or within three months of the funding of that Mortgage Loan—whichever came sooner. So if Lender loaned Borrower $500,000 to make a Mortgage Loan, Borrower would have to (and would) repay that $500,000 to Lender upon the sale of this Mortgage Loan to an institutional buyer. And if Borrower could not sell this Mortgage Loan within three months

2

(which generally didn't happen), Borrower would have to repay this $500,000 at the end of these three months.

7.      While the terms of this arrangement and warehouse line of credit were based on an oral (rather than written) agreement between the parties, the parties acted in strict compliance with these agreed-upon terms from September 2020 through October 2022. Indeed, between September 2020 and October 2022, Borrower drew down on this line of credit over 500 times for almost $300 million. And until recently, Borrower made each of its monthly debt-service payments on time, and repaid all the money it borrowed immediately upon the sale of each underlying Mortgage Loan to an institutional buyer.

8.      But in the past two months, citing a cooldown in the market for the origination and purchase of Mortgage Loans in the Primary Loan Business and in the Secondary-Market Loan Business, Borrower has not paid any interest on the line of credit to Lender—for a total of $355,833.33 ($180,833.33 for October and $175,000 for November).

9.      And worse, Borrower has failed to repay $10,563,345.06 in principal that Borrower drew against the line of credit to fund 23 Mortgage Loans—some funded over four months ago.

10.     While Borrower and its principals have repeatedly claimed that these 23 Mortgage Loans have not yet been sold, and have not been encumbered, Borrower and its counsel have refused to provide any proof supporting these claims. Borrower's principals have also intentionally given Lender the runaround, with vague references to "losses" and a "settlement" with Lender. And Borrower and its counsel have even refused to put Lender in touch with the "custodians"—upon information and belief, either U.S. Bank or Wells Fargo— allegedly holding these 23 Mortgage Loans pending sale to an institutional buyer.

11.     Further, Borrower also recently removed Lender's Box.com access to the underwriting documents that Borrower previously provided for the Mortgage Loans, including the 23 purportedly unsold Mortgage Loans. Indeed, when Borrower would request funding for a particular Mortgage Loan, it would put all the underwriting documents for that Mortgage Loan in a Box.com folder and send Lender a link to that folder. But when Lender recently attempted to access these Box.com folders, the folders were gone—or at least Lender's access removed so Lender could no longer see the folders. Lender questioned Malik about this, to which Malik responded that Borrower was no longer using Box.com collateral and that Borrower would "ship all loan files / collateral we have to you." But Borrower never did this. Nor was there any reason for Borrower to abruptly stop using Box.com. And even if it did, there was no reason for Borrower to delete or remove Lender's access from Box.com folders for Mortgage Loans that had already closed. This shows that Borrower is going out of its way to put and keep Lender in the dark about these 23 Mortgage Loans.

12.     Thus, given that most of Borrower's 23 purportedly unsold Mortgage Loans were funded several months ago, yet have not been repaid (despite typically being sold within 30 to 45 days), and given that Borrower has almost completely and intentionally shut Lender out from any information about these 23 Mortgage Loans, upon information and belief, Borrower has sold or encumbered some of, or all, these 23 Mortgage Loans and has retained the proceeds for itself.

13.     And further upon information and belief, one of, or all, Malik, Eastone, Lee, Yu, Wu, and Global Bank (the latter beneficially owned primarily by Lee and involved in Borrower's business) have retained or diverted these proceeds for their personal benefit as well.

14.     Lender thus brings this suit to recover the amounts that Borrower owes to it, and which, upon information and belief, Malik, Eastone, Lee, Yu, Wu, and Global Bank stole.

## PARTIES

15.     Plaintiff Lender is a New York limited liability company. Its members are natural persons who are citizens of Florida and Connecticut.

16.     Defendant MTCM-NY is a New York limited liability company. Defendant MTCM-Del is a Delaware limited liability company. Upon information and belief, the members of both MTCM-NY and MTCM-Del are Defendants Kamal Malik and Eastone Equities. As explained below, upon information and belief, Kamal Malik is a citizen of the United Kingdom, but is also lawfully admitted for permanent residence in the United States, domiciled in Maryland or New Jersey. Also, upon information and belief, the sole member of Eastone Equities, Defendant Kevin Yu, is a citizen of New York. Thus, upon information and belief, both Defendants MTCM-NY and MTCM-Del are citizens of New York, and either or both of Maryland and New Jersey (as well as citizens or subjects of a foreign state).

17.     Defendant Kamal Malik is a natural person who, upon information and belief, is a citizen or subject of the United Kingdom, but is also lawfully admitted for permanent residence in the United States, domiciled in Maryland or New Jersey. As explained above, Kamal Malik is a member and principal of Borrower.

18.     Defendant Eastone Equities is a New York limited liability company. Upon information and belief, its sole member is Kevin Yu, who, as explained below, is a natural person who is a citizen of New York. Thus, Eastone Equities is a citizen of New York. As explained above, Eastone Equities is also a member of Borrower.

19.     Defendant Anthony Lee is a natural person who, upon information and belief, is a citizen of New York. Upon information and belief, Lee is the Chairman of the Board of

Managers and CEO of Eastone Equities, and is also a principal of Borrower. Also, upon information and belief, Lee is a majority beneficial owner of Defendant Global Bank.

20.     Defendant Kevin Yu is a natural person who, upon information and belief, is a citizen of New York. As explained above, upon information and belief, Yu is the sole member of Eastone Equities, and is also a principal of Borrower.

21.     Defendant Fangzhou Wu is a natural person who, upon information and belief, is a citizen or subject of a foreign state, domiciled in New York. Upon information and belief, Wu is an authorized representative and principal of Eastone Equities, and is also a principal of Borrower.

22.     Defendant Global Bank is a New York State-chartered commercial bank. It was incorporated and has its principal place of business and main office in New York. Thus, Global Bank is a citizen of New York. As explained above, upon information and belief, Lee is a majority beneficial owner of Global Bank.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2), because there is diversity of citizenship and the matter in controversy exceeds $75,000.

24.     This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) and C.P.L.R. 302(a)(1) and (2), because Defendants transacted business in, and committed tortious acts within, New York State, and Lender's claims in this case arise from these contacts. This Court also has general personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) and C.P.L.R. 301, because, upon information and belief, they each have continuous and systematic contacts with New York State.,

25.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Lender's claims occurred in this district.

## FACTUAL ALLEGATIONS

**A.      Lender Agrees to Provide Borrower With a Warehouse Line of Credit**

26.     Borrower is in the business of making Mortgage Loans to home buyers across the country, who would buy homes for investment purposes—the Primary Loan Business described above.

27.     Specifically, Borrower originates these Mortgage Loans, and within 30 to 45 days of origination, sells the loan to institutional buyers, like Morgan Stanley Mortgage Capital Holdings LLC, Verus Mortgage Capital, Annaly Capital Management, Inc., and Soros Mortgage Capital, among others.

28.     Critical to Borrower's Primary Loan Business is its ability re-cycle the capital available to Borrower to originate loans, thus its ability to quickly resell these Mortgage Loans, pay down the credit line made available by Lender, and re-borrow under the credit line. And so, according to Malik, Borrower would make a loan only if the loan had been "pre-sold"—meaning that Borrower had a commitment from an institutional buyer to promptly buy that loan from Borrower.

29.     Upon information and belief, these institutional buyers would then bundle these, among other, Mortgage Loans together, and securitize them so they could be traded as mortgage-backed securities.

30.     Borrower would make money on these Mortgage Loans in several ways.

31.     First, Borrower would charge the mortgage borrower an "origination fee"—usually a few percentage points on the amount of the Mortgage Loan, which would be paid upon closing of the Mortgage Loan.

32.     Second, Borrower would then sell each Mortgage Loan to whichever institutional buyer to which it had pre-sold that Mortgage Loan. And until recently, the price that this institutional buyer would pay would be a few percentage points above par—with par being the outstanding principal balance of each Mortgage Loan.

33.     Third, Borrower would also collect underwriting fees.

34.     During the summer of 2020, Malik and Lee, on behalf of Borrower, approached Lender's principals about Lender providing financing for Borrower's Primary Loan Business. An email, dated July 15, 2020, from Malik to one of Lender's principals asking for this "funding line" for Borrower's business is attached as Exhibit 1.

35.     After several conversations throughout the summer of 2020, Lender agreed to provide Borrower with a warehouse funding facility or line of credit—which is a line of credit given to a loan originator, like Borrower—on the following terms:

a.     Lender would provide Borrower with a line of credit on which Borrower could draw to fund each of the Mortgage Loans it was making.

b.     For each loan, Borrower would provide Lender with the name of the mortgagor (Borrower's mortgage borrower), the address of the property that was to secure the mortgage loan that Borrower was making to its borrower, the amount of the loan, the closing date, and the institutional buyer to which the loan was pre-sold.

c.     Lender would wire the funds for each loan directly to the closing agent—generally a title company or law firm—responsible for closing each Mortgage Loan.

Thus, rather than Lender wiring funds to Borrower, and then Borrower wiring these funds to the closing agent for the Mortgage Loan, Lender agreed to wire the funds directly to the closing agent. For example, if Borrower were making a $500,000 Mortgage Loan to a mortgage borrower, Borrower would give Lender the details for this loan, and Lender would wire the $500,000 directly to the closing agent for this Mortgage Loan. The mortgage borrower would then be indebted to Borrower for $500,000 (until Borrower sold the loan, at which point the mortgage borrower would then be indebted to the institutional buyer of the Mortgage Loan), and Borrower would, in turn, be indebted to Lender for $500,000.

   d. Malik, on behalf of Borrower, represented that every Mortgage Loan that Borrower made—the funds for which Lender loaned to Borrower under the credit line— was pre-sold to an institutional buyer. Lender would not have made any loans to Borrower absent this representation.

   e. Between the time that Borrower made each Mortgage Loan and the time that Borrower sold that Mortgage Loan to an institutional buyer, the Mortgage Loan would be held by a "custodian," which would hold each loan for the benefit of Borrower (the then-owner of the loan), the to-be institutional buyer, and (indirectly) Lender. Upon information and belief, based on repeated assurances by Borrower to Lender, the 23 Mortgage Loans at issue in this action are held by either U.S. Bank or Wells Fargo as custodian.

   f. Upon Borrower's sale of each Mortgage Loan to an institutional buyer, Lender would be repaid the principal on the loan it had made to Borrower to fund that specific Mortgage Loan. Borrower was not permitted to transfer or otherwise encumber

any Mortgage Loan it made, other than in connection with a sale to an institutional buyer—upon the closing of which Lender would be immediately repaid. Thus, on the date of the closing of the sale of the $500,000 Mortgage Loan in the example above to an institutional buyer, Lender would be repaid its $500,000 principal that it loaned to Borrower. Borrower had three months to sell each Mortgage Loan it made, at which time the principal that Lender had loaned to Borrower for that Mortgage Loan would become due regardless of whether Borrower had sold the underlying Mortgage Loan. A text exchange between Malik and one of Lender's principals, from September 2022, confirming this three-month requirement is attached as Exhibit 2.

g.      Borrower would pay monthly debt service on the line of credit at an annual interest rate of 14%. Interest was calculated on the total amount of the credit line that Lender provided to Borrower at any given time, even if Borrower did not draw down the entire credit line or had paid down some of, or all, the credit line. For example, if Lender provided Borrower a $15 million credit line in a given month, Borrower would owe interest on the full $15 million available to it, even though it may have used only $10 million of the credit line at any given time. The amount of the credit line was subject to agreement between Lender and Borrower, and as explained below, changed over time.

h.      Borrower would pay a fee to Global Bank to effectively guarantee the representations and warranties regarding the Mortgage Loans that Borrower was required to make to each institutional buyer. Indeed, after the 2008 mortgage crisis, rules were put in place permitting a buyer of a mortgage loan to "put"—or resell—the mortgage loan to the seller at par if certain representations and warranties turned out to be false. Thus, to avoid any claimed liability against Lender, the parties agreed that Global Bank would

take on any potential "put-back" exposure. In this way, Global Bank—Lee's bank—became part of the parties' lending arrangement.

36.     These terms were all agreed verbally by and between Lender and Borrower, each acting through their authorized principals. Given this verbal agreement, no master-lending agreement or promissory notes were ever prepared.

37.     On September 15, 2021, however, at Borrower's request, Lender provided a letter to Borrower—which Malik said was required for Borrower's outside accountants—describing the material terms of the lending agreement between the parties. A copy of an email, dated September 14, 2021, from Malik to one of Lender's principals requesting this letter is attached as Exhibit 3.

38.     In this letter, Lender wrote that it had agreed to provide a "funding facility"—the line of credit described above—to Borrower so that Borrower could originate Mortgage Loans. This letter further stated that the loans were "'warehoused'" on Borrower's balance sheet "until they are sold" by Borrower, "at which time the Funding Facility is repaid." The letter also explained that Borrower owed an "annual 14% rate of interest, payable monthly, on the Funding Facility, that is calculated on the highest aggregate amount advanced." A copy of this letter is attached as Exhibit 4.

39.     Borrower accepted this letter from Lender, and upon information and belief, provided it to its outside accountants. And Borrower certainly never objected to anything in this letter, nor did it ever claim that any of the terms of its agreement with Lender set forth in this letter were inaccurate.

**B.**   **Borrower Draws Down on the Line of Credit to Make Over 500 Different Mortgage Loans, and Immediately Repays Lender Each Time It Sells a Mortgage Loan**

40.     Lender made its first five loans to Borrower on September 8, 2020. The line of credit started at approximately $2.0 million, but by agreement between Borrower and Lender, was eventually increased throughout 2020 and 2021 to $10 million, then $15 million, then $20 million, and ultimately, $30 million—all based on Borrower's increasing need for credit due to the ramp up of its Primary Loan Business.

41.     This Primary Loan Business proved to be quite lucrative for Borrower, as Borrower drew down on its credit line with Lender for over 500 Mortgage Loans between September 2020 and October 2022—totaling almost $300 million, with amounts drawn to fund individual Mortgage Loans ranging from $64,000 to $2,785,000.

42.     Specifically, in 2020, Borrower drew down on the credit line for 22 Mortgage Loans, totaling $7,868,747.53. Borrower then sold each of these Mortgage Loans to an institutional buyer.

43.     In 2021, Borrower drew down on the credit line for 413 Mortgage Loans, totaling $201,807,529.93. Borrower then sold each of these Mortgage Loans (other than a few that had been funded but did not end up closing—in which case Borrower immediately repaid Lender) to an institutional buyer.

44.     And in 2022, Borrower drew down on the credit line for 134 Mortgage Loans, totaling $75,460,322.20. Borrower then sold each of these Mortgage Loans to an institutional buyer, with the exception of the 23 Mortgage Loans (totaling $10,563,345.06) that remain

outstanding and which Borrower claims have not be sold and which have not been repaid to
Lender (explained further below).

45.     Between September 2020 and September 2022, with the exception of the 23
Mortgage Loans that remain outstanding (explained below), Borrower repaid each and every one
of these loans, in full, immediately upon closing of its sale of each Mortgage Loan to an
institutional buyer. Indeed, for most of this two-year period, the institutional buyer of each
Mortgage Loan would generally pay the principal owed by Borrower directly to Lender.

46.     During this same period, Borrower also paid the interest it owed—calculated
based on the total amount of the credit line, regardless of how much of the credit line Borrower
had used—every single month.

47.     As explained above, Borrower purportedly pre-sold each of the Mortgage Loans it
made at a premium—usually several points above par—thus enabling it to turn a significant
profit on each loan, even with the 14% in interest due to Lender.

**C.     Borrower Abruptly Stops Paying Debt Service, Cuts Off Lender's Access to
Information, and Refuses to Repay Outstanding Amounts Borrowed**

48.     Starting in the spring of 2022, mortgage rates started to increase nationally, and
the market for the origination of Mortgage Loans and for the sale of these Mortgage Loans that
Borrower was making began to cool down, as did the market for Borrower's related Secondary-
Market Loan Business.

49.     So on April 1, 2022, at Borrower's request, the credit line was reduced to $20
million. And on June 30, 2022, it was reduced to $15 million. This was because Borrower was
originating fewer and fewer Mortgage Loans and therefore required less credit. And this

reduction in the total amount of the credit line also served to decrease the amount of interest Borrower would owe Lender.

50.     Further, as a courtesy, for the months of April and May 2022, Lender also agreed to reduce the interest rate that Borrower had to pay from 14% to 12%, though by way of mutual agreement between Lender and Borrower, the rate went back up to 14% in June 2022—which is what the rate remains at today.

51.     Between April and October 2022, as always, Borrower repaid principal amounts to Lender when, according to Borrower, it sold a Mortgage Loan that Lender had funded. In addition, between April and September 2022, Borrower continued to pay its monthly debt service to Lender.

52.     But in late October 2022, citing a further cooldown in the market for the origination and purchase of Mortgage Loans and for Borrower's related Secondary-Market Loan Business, Malik came to Borrower's principals and said that Borrower's businesses were coming to a halt and that it would not be making any more Mortgage Loans. Malik also said that Borrower could not afford to pay its debt service for October 2022—which was $180,833.33 for the month. And Borrower in fact did not pay debt service for October 2022.

53.     Lender thus began demanding detailed information about the status of each outstanding underlying Mortgage Loan—including when each would be sold and to whom. This information was critical to Lender, because, as explained above, Malik had always represented that each Mortgage Loan was "pre-sold" to an institutional buyer, and so it didn't make sense that the sale of these loans was now delayed—some four to five months—when the typical turnaround had historically been 30 to 45 days and the sale was assured.

54.     Fearing that some of these Mortgage Loans may have actually already been sold or otherwise borrowed against and encumbered—with Borrower retaining the proceeds instead of repaying the principal to Lender, which would have been a material breach of the agreed-upon terms of the credit line —Lender also began demanding information about which custodians were holding which loans. And Lender also asked Malik and Lee to put it directly in touch with the appropriate individuals at each custodian so Lender could confirm that each Mortgage Loan was where Borrower claimed it was—and remained unsold and unencumbered.

55.     But contrary to the completely open stream of information during the parties' long-term lending relationship to that point, Borrower refused to provide this information to Lender with any proof or specificity. And most critically, Borrower refused to put Lender in touch with anyone at the custodians of these Mortgage Loans so that Lender could independently confirm that these Mortgage Loans had not been sold or encumbered.

56.     Further, beginning in the summer of 2022, Lender started to get repaid directly from Borrower, rather than from the institutional buyers of Borrower's Mortgage Loans. And when asked about this change in practice, Malik said that this was because some of the institutional buyers did not want to have to deal with multiple wire transfers on a purchase of a loan, and wanted to just send all the money to Borrower for it to disburse. Because Lender continued to get repaid on the draws Borrower had taken, Lender did not initially challenge Malik on this explanation.

57.     But when put in context with Borrower's struggles over the last two months and its ultimate declared winddown of both the Primary Loan Business and the Secondary-Market Loan Business, this practice is now incredibly suspicious.

58.     Indeed, when a principal repayment came directly from an institutional buyer, Lender could be confident that it was being repaid immediately upon the sale of the underlying Mortgage Loan. But if Borrower had more recently sold or otherwise borrowed against and encumbered some of these Mortgage Loans and kept the proceeds for itself, as a means of covering losses incurred in either or both of the Primary Loan Business and the Secondary-Market Loan Business, rather than repaying Lender, then this "check" on the timing of repayment was no longer present.

59.     For example, Borrower could have sold one of the Mortgage Loans and retained the proceeds, and then paid Lender principal for that Mortgage Loan only upon the sale of a second Mortgage Loan, or from other funds available to Borrower —all the while telling Lender that the first Mortgage Loan was just sold and that the second (the proceeds of which were used to repay Lender the principal from the first) had still not been sold. If this is what Borrower were doing, this would have been a material breach of the terms of the credit line.

60.     Borrower also has not paid its November 2022 debt service—$175,000 for the month.

61.     According to Borrower, it has not sold any of the remaining 23 Mortgage Loans at issue in this action, leaving these remaining 23 Mortgage Loans at risk. Nor has Borrower repaid any further principal to Lender in more than a month, even though some of these 23 Mortgage Loans are over four months old. Indeed, the oldest of the 23 Mortgage Loans was funded on July 18, 2022, more than four months ago, with a prompt sale to Morgan Stanley purportedly assured.

62.     The total of the outstanding 23 Mortgage Loans is $10,563,345.06. Copies of Borrower's funding requests for each of these 23 Mortgage Loans, along with proof that each of

these 23 Mortgage Loans was funded by Lender, are attached as Exhibits 5 to 27. And a list of

these 23 Mortgage Loans is also attached as Exhibit 28.

63.     Over the last several weeks, Lender has repeatedly asked Malik and Lee for proof

that the purportedly outstanding 23 Mortgage Loans have not been sold or otherwise borrowed

against and encumbered, as well as contact information for the appropriate person at U.S. Bank

and Wells Fargo, the two custodians believed to be holding these 23 Mortgage Loans. But Malik

and Lee have refused. And while they have insisted that these 23 Mortgage Loans have not been

sold or encumbered, they have refused to provide backup for this claim.

64.     Further, on November 9, 2022, Lender discovered that Borrower had removed

Lender's access to Borrower's Box.com account containing the underwriting documents

underlying every Mortgage Loan originated and funded by the credit facility, including the 23

purportedly unsold Mortgage Loans. Indeed, when Borrower would request funding for a

particular Mortgage Loan, it would put all the underwriting documents for that Mortgage Loan in

a Box.com account folder to which Lender had real-time access. But when Lender attempted to

access this Box.com account on November 9, Lender's access had been deleted so Lender could

no longer see the loan documents underlying the Mortgage Loans.

65.     Lender questioned Malik about this, to which Malik responded that Borrower was

no longer using Box.com and would "ship all loan files / collateral we have to you." A copy of

an email from Malik, dated November 9, 2022, saying this is attached as Exhibit 29.

66.     But Borrower never "ship[ped]" or otherwise sent any of these loan files or other

loan documents to Lender. Nor was there any reason for Borrower to abruptly stop using

Box.com. And even if Borrower did just innocently stop using Box.com, there was no reason for

Borrower to delete or remove Lender's access from Box.com folders for Mortgage Loans that

had already closed. This shows that Borrower has recently gone out of its way to put and keep Lender in the dark about these 23 Mortgage Loans.

67.     Malik and Lee have also sought to string Lender along, by claiming that some of the Mortgage Loans were being sold last week when they were not, and by making vague references to "losses on each loan"—suggesting that they have already sold some of the 23 purportedly unsold Mortgage Loans—and a potential "settlement" with Lender. A copy of a text-message exchange, from November 22, 2022, between Malik and Lee—which Lee sent to one of Lender's principals (perhaps in an attempt to play them against each other)—is attached as Exhibit 30.

68.     Further, Lender has told Borrower that it would even take direct ownership of these 23 underlying Mortgage Loans serving as collateral security as a means of enabling Borrower to pay down the outstanding principal owed on the credit facility. But Borrower has continued to refuse to provide any documents or specific information about the status of these loans.

69.     On November 17, 2022, Malik informed one of Lender's principals by text message that Borrower had retained counsel to "help wind up everything." A copy of this text message is attached as Exhibit 31.

70.     On November 21, 2022, Lender's counsel spoke with Borrower's counsel and repeated Lender's demand that Borrower provide documents and specific information about the status of each of the 23 purportedly outstanding Mortgage Loans. Lender's counsel also demanded that Borrower's counsel confirm that none of these Mortgage Loans had been sold or encumbered.

71.     While Borrower's counsel promised to speak to Borrower's principals and revert back right away, it has been a week and Borrower's counsel still has not provided any of the requested information—or even confirmation that these 23 Mortgage Loans have not been sold or encumbered. This refusal to provide this confirmation is particularly troubling, given that Borrower's counsel should have been able to confirm this with Borrower's principals within minutes—yet has refused to do so. A copy of Lender's and Borrower's counsel's most recent email exchange is attached as Exhibit 32.

72.     Thus, Borrower and its principals have intentionally deprived Lender of any visibility into the status of the purportedly unsold 23 Mortgage Loans—deliberately keeping Lender in the dark.

73.     Given that most of Borrower's 23 purportedly unsold Mortgage Loans were funded several months ago, yet have not been repaid (despite typically being sold within 30 to 45 days), and given that Borrower has completely shut Lender out from any information about these 23 Mortgage Loans (including by way of all of its suspicious activity described above), upon information and belief, Borrower has sold or otherwise borrowed against and encumbered some of, or all, these 23 Mortgage Loans, in material breach of the terms of the credit facility, and has retained the proceeds for itself—possibly to offset other losses in the Primary Loan Business and the Secondary-Market Loan Business.

74.     And further upon information and belief, one of, or all, Malik, Eastone, Lee, Yu, Wu, and Global Bank have retained or diverted these proceeds for their personal benefit as well.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Borrower)

75.     Lender repeats the allegations above as if fully set forth here.

76.     Lender and Borrower are parties to an oral agreement, under which Lender would provide Borrower with a warehouse line of credit in accordance with the terms set forth in paragraph 35 above.

77.     This oral agreement is a valid and binding contract between Lender and Borrower.

78.     The mutual exchange of promises of this oral agreement was sufficient consideration.

79.     Lender materially complied with all of its obligations under this oral agreement.

80.     Borrower materially breached its obligations under this oral agreement by (i) failing to pay monthly debt service for the months of October and November 2022; (ii) failing to repay principal on 11 loans funded over three months ago, the total of which is $4,975,410.20; and (iii) upon information and belief, failing to repay principal to Lender upon the sale (or other encumbrance) of the underlying, purportedly outstanding 23 Mortgage Loans.

81.     Lender has been directly and proximately damaged by Borrower's breaches of this oral agreement.

82.     Thus, Borrower is liable (as it relates to MTCM-NY and MTCM-Del, jointly and severally) to Owner for an amount to be determined at trial, but which is not less than $10,919,178.39, which is equal to (i) $355,833.33 in unpaid debt service for October and November 2022, plus (ii) $10,563,345.06 in unpaid principal; plus contractual pre- and post-judgment interest; plus attorneys' fees and costs; plus punitive damages.

## SECOND CAUSE OF ACTION
### (Conversion Against Kamal Malik, Eastone Equities, Anthony Lee, Kevin Yu, Fangzhou Wu, and Global Bank)

83.     Lender repeats the allegations above as if fully set forth here.

84.     Given that most of Borrower's 23 purportedly unsold Mortgage Loans were funded several months ago, yet have not been repaid (despite typically being sold within 30 to 45 days), and given that Borrower has completely shut Lender out from any information about these 23 Mortgage Loans (including by way of all of its suspicious activity described above), upon information and belief, Borrower has sold or otherwise borrowed against and encumbered some of, or all, these 23 Mortgage Loans and has retained the proceeds for itself.

85.     Further upon information and belief, one of, or all, Malik, Eastone, Lee, Yu, Wu, and Global Bank have exercised an unauthorized dominion over the sale or encumbrance proceeds of these 23 Mortgage Loans by retaining or diverting these proceeds for their personal benefit.

86.     As a result, Malik, Eastone, Lee, Yu, Wu, and Global Bank are liable, jointly and severally, to Lender for an amount to be determined at trial, but which is not less than $10,563,345.06; plus pre- and post-judgment interest; plus attorneys' fees and costs; plus punitive damages.

**WHEREFORE**, Lender respectfully requests that this Court enter judgment in its favor against Defendants on all Lender's causes of action, awarding Lender damages in an amount to be determined at trial, but not less than, on its first cause of action, $10,919,178.39 against Borrower, jointly and severally, and on its second cause of action, $10,563,345.06 against all Defendants, jointly and severally; plus pre- and post-judgment interest (contractual or statutory,

as the case may be), attorneys' fees and costs, and punitive damages (all jointly and severally

against all Defendants as well); plus such other and further relief as may be just and proper.

Dated: November 28, 2022
       New York, New York

                        Respectfully submitted,

                        **SCHLAM STONE & DOLAN LLP**

                        By: <u>/s/ Joshua Wurtzel</u>
                              Joshua Wurtzel
                              John Moore
                              26 Broadway
                              New York, New York 10004
                              Tel.: (212) 612-1226
                              Fax: (212) 612-1226
                              Email: jwurtzel@schlamstone.com
                              Email: jmoore@schlamstone.com

                        *Attorneys for Plaintiff Money Tree Capital*
                        *Funding, LLC*