UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MONEY TREE CAPITAL FUNDING, LLC,

Plaintiff,

– against –

MONEY TREE CAPITAL MARKETS LLC, a New York limited liability company, MONEY TREE CAPITAL MARKETS LLC, a Delaware limited liability company, *and* KAMAL MALIK,

Defendants.

**OPINION & ORDER**

22-cv-10084 (ER)

---

<u>Ramos, D.J.</u>:

Money Tree Capital Funding, LLC ("MTCF") brings this action against Money Tree Capital Markets LLC, a New York limited liability company ("Money Tree NY"), and Money Tree Capital Markets LLC, a Delaware limited liability company ("Money Tree DE") (collectively the "Money Tree Defendants") for breach of contract, or in the alternative, for unjust enrichment. MTCF also brings suit against Kamal Malik ("Malik") for fraudulent inducement. Doc. 112. Before the Court are the Money Tree Defendants' and Malik's motions to dismiss MTCF's First Amended Complaint for lack of diversity jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Docs. 114, 116. For the reasons set forth below, the motions are DENIED.

## I.    BACKGROUND

### A.  Factual Background[1]

#### 1.  MTCF

MTCF is a New York limited liability company with three members:  Keith Stein, Oliver Cojot, and Ira Saferstein.[2]  ¶ 20.  Stein is a citizen of Connecticut, and Cojot and Saferstein are citizens of Florida.  *Id.*

Stein, an attorney, previously lived in Manhattan, but he sold his apartment there in August 2021 and moved to Connecticut starting on September 8, 2021.  ¶ 21; *see also* Doc. 49, Stein Decl. at ¶¶ 4–5.  He considers Connecticut his home and intends to remain there.  *Id.* at ¶ 10.  He lists his Connecticut address on his federal income-tax return, holds a Connecticut driver's license, is registered to vote in Connecticut, and is billed for utilities in Connecticut.  *Id.*; *see also* Doc. 112–2 (Stein's 2021 income-tax return, his driver's license issued in 2022, his voter registration dated November 4, 2022, and his utility bill dated August 2022).  Stein owns a summer vacation home on Fire Island in New York, but goes there only for vacation, and exclusively in the summer months.  ¶ 21; *see also* Doc. 49, Stein Decl. ¶ 6.  The home is fully closed from October–April.  *Id.*; *see also* Doc. 112–2 (invoice and screenshot of text message exchange showing that Stein's Fire Island home was opened in the spring of 2022 and closed in the fall of 2022).  On a search conducted on February 2, 2023, Stein did not appear on the Connecticut database of attorneys registered in the state.  *See* Doc. 109–5 (a list of registered Connecticut lawyers named Stein).  As of February 6, 2023, Stein appears as a New York licensed attorney.  Doc. 109–4 (screenshot of Stein's attorney registration with the New York State Unified Court System).

Cojot has lived in Florida since 2017.  ¶ 23.  He owns a condominium in Florida where he resides, lists his Florida address on his federal income-tax return, holds a

---

[1] Unless otherwise noted, citations to "¶ _" refer to the amended complaint, Doc. 112.

[2] Despite having similar names, there is no corporate relationship between MTCF and defendants Money Tree Capital Markets (NY and DE).

Florida driver's license, is registered to vote in Florida, and is billed for utilities in Florida. *Id.; see also* Doc. 112–4 (Cojot's driver's license issued on October 22, 2019, his voter's registration dated October 22, 2019, his 2021 income-tax return, his utility notice dated October 21, 2022, and his deed for his Florida condominium purchased in March 2022).

Saferstein has lived in Florida since August 2018.  ¶ 22.  He lists his Florida address on his federal income-tax return, holds a Florida driver's license, is registered to vote in Florida, and is billed for utilities in Florida.  *Id.; see also* Doc. 112–3 (Saferstein's voter registration dated January 2018, driver's license issued in 2018, his 2021 income-tax return, and his utility bill for a period starting in October 2022).  Saferstein works for Titan Capital–EMG, LLC ("Titan Capital"), which maintains a Manhattan office.[3]  ¶ 22.

  *2. Defendants*

Malik is a citizen of the United Kingdom, a permanent resident in the United States, and is domiciled, per his counsel, in Virginia.[4]  He is a principal of the Money Tree Defendants.  ¶ 26.  Money Tree NY is a New York limited liability company, with two members—Malik and Eastone Equities LLC.  *Id.*  The sole member of Eastone Equities LLC is Kevin Yu, who is a citizen of New York.  *Id.*  Thus, Money Tree NY is a citizen of New York and Virginia, in addition to a citizen or subject of the United Kingdom.  Money Tree DE is a Delaware limited liability company, with Malik as its sole member.  Thus, Money Tree DE is a citizen of Virginia, as well as a citizen or subject of the United Kingdom.

---

[3] The amended complaint pleads that Saferstein does not live in Manhattan, and is silent on whether Saferstein travels to New York for work.  ¶ 22.

[4] The amended complaint pleads that "upon information and belief" Malik "is domiciled in Maryland, New Jersey, or Virginia."  ¶ 24.  On December 2, 2022, Malik's counsel represented to this Court that "I believe he is a resident of Virginia." Dec. 2, 2022 Conference Tr. at 28:20.  As relevant to this case, regardless of Malik's actual domicile, the parties agree that he is not a resident of New York.

*3.  The Money Tree Defendants' Business*

The Money Tree Defendants make mortgage loans to home buyers who buy homes for investment purposes.  ¶¶ 2, 30.  The Money Tree Defendants then "pre-sell" these mortgage loans to institutional buyers[5]— buyers who had already made a commitment to "promptly" buy a specific mortgage loan, prior to their actual purchase. ¶¶ 5, 31.  Critical to the Money Tree Defendants' business was the ability to re-cycle the capital they had available to them, and thus their ability to quickly make a loan, sell it to an institutional buyer, and then re-borrow money to make more loans.  ¶ 32.

*4.  The Alleged Agreement*

During the summer of 2020, Malik approached MTCF's principals, in their personal capacities, about financing Money Tree NY.  ¶ 38.  MTCF's principals provided the initial financing.  ¶ 39.  MTCF was then formed on July 31, 2020.  *Id*.  MTCF created a warehouse funding facility (the "Facility"), which is a line of credit given to a party that makes mortgage loans.  ¶ 4.  After MTCF was formed, it exclusively financed the Facility.  ¶ 50.

The amended complaint alleges that MTCF entered into an agreement with Money Tree NY[6] (the "Agreement"), pursuant to which MTCF provided the Facility under certain conditions.  ¶¶ 4, 39.  First, Money Tree NY would provide MTCF with certain information about each mortgage loan transaction.  ¶ 39(b).  Second, Money Tree NY was required to repay the principal it borrowed from MTCF immediately upon the sale of a mortgage loan to an institutional buyer, or within three months of the funding of that mortgage loan—whichever came sooner.  ¶¶ 6, 39(f).  Third, Money Tree NY agreed to pay monthly interest at an annual rate of 14%, calculated on the total amount of credit available under the credit line, regardless of the amount Money Tree NY decided to draw

---

[5] The institutional buyers include Morgan Stanley Mortgage Capital Holdings and Soros Mortgage Capital. ¶ 5.

[6] As discussed further below, after April 14, 2022, MTCF also funded Money Tree DE.  ¶ 58.

upon.[7] ¶ 39(g).  The amount of funds available under the Facility was subject to agreement between MTCF and Money Tree NY, and changed over time by the parties' agreement.  *Id.*  There was no set term for the Facility.  ¶ 39(i).  According to MTCF, either party could end the Agreement at any time.[8]  Though the parties did discuss more formally memorializing the terms of their Agreement, they did not do so.  ¶ 45.

Throughout 2021 to 2022, The parties exchanged multiple emails and texts regarding the Agreement.  In an April 7, 2021 email from Malik to Plaintiff's principals and Eric Oliver (a lawyer), Malik stated that Oliver was "very familiar with warehouse/credit lines, and all the legal [*sic*] . . .  in order to formalize our credit line with yourselves" and that Oliver "can help [them] put together the documentation required to meet [Money Tree NY's] requirements."  ¶ 45; *see also* Doc. 112–9 (April 7, 2021 email).  In another email exchange between Malik and Cojot on April 19, 2021, when Malik asked for a loan, Cojot stated "I will transfer the [approximately $3 million amount] to [MTCF] and [Stein] . . . can fund as you need the money . . . ."  Malik responded, in part, that "[a]ny loans we sell [] will go back to [MTCF] as per normal."  ¶ 41; *see also* Doc. 112–6 (April 19, 2021 email).  In a September 14, 2021 email exchange between Malik and Saferstein, Malik asked for "a letter from [MTCF] to state that [MTCF] [is] providing a lending facility to [Money Tree NY]" in order to show its balance sheet to its accountants.  ¶ 42; *see also* Doc. 112–7 (September 14, 2021 email).  The letter prepared by Stein in response stated:

> [MTCF] has provided a [] [F]acility . . . to [Money Tree NY] pursuant to
> which [MTCF] funds 100% of the principal amount of residential mortgage

---

[7] For the months of April and May 2022, MTCF "agreed" to reduce the interest rate from 14% to 12%. ¶ 64.  "[B]y way of mutual agreement" between MTCF and the Money Tree Defendants, the rate went back to 14% in June 2022.  *Id.*  The Money Tree Defendants dispute this, alleging that MTCF unilaterally decreased the rate of interest it charged.  Doc. 115 at 17.

[8] In its briefing, MTCF states that either party could end the Agreement "as long as outstanding amounts borrowed were repaid" and cites to ¶ 39(i) (which states "[t]here was no set term for the [] Facility") for this proposition, but this is not explicitly stated in the amended complaint.

> loans originated and closed by [Money Tree NY].  The loans are "warehoused" on [Money Tree NY's] balance sheet until they are sold by [Money Tree NY], at which time the [] Facility is repaid. [MTCF] is paid an annual 14% rate of interest, payable monthly, on the [] Facility . . . .  This letter is for the sole use and benefit of [Money Tree NY's] outside accounting firm, to enable such firm to update [Money Tree NY's] balance sheet to include the liability of the [] Facility.

Doc. 112–8 (September 15, 2021 Letter "Re:  Funding Facility for Money Tree Capital Markets LLC).  Lastly, in a September 5, 2022 text message exchange between Malik and "one of [MTCF's] principals," presumably Saferstein,[9] the parties' discussed the alleged Agreement's three-month requirement.  ¶ 39(f); Doc. 112–5.

> Saferstein:  Are you able to buy them back from us[]?

> Malik:  We don't have that level of cash to buy them back unfortunately

> Saferstein:  Our agreement was always that you would buyback any loan over 3 months.  We have been pretty flexible since in the past it has just been one or two loans.  I really do not understand how a "presold" [loan] that is "cleared" can be so delayed.

> Malik:  . . .  the loans will get sold I have no doubt[.]

Doc. 112–5 (September 5, 2022 text message exchange).

 5. *Business between the Parties*

The complaint alleges that Money Tree NY largely repaid the amount financed through the Facility on each mortgage loan between September 2020 and September 2022.  ¶ 55.  During the same period, Money Tree NY also allegedly paid the interest owed every month.  ¶ 56.  Starting in the spring of 2022, however, mortgage rates started to increase nationally, resulting in in a slowdown in the mortgage loan business.  ¶ 61.  On April 14, 2022, Malik formed Money Tree DE, and (allegedly without MTCF's knowledge) began using that entity to make mortgage loans.  ¶¶ 58–59.  Beginning in the

---

[9] The amended complaint does not provide the name of which principal Malik spoke to in the text message exchange.  However, in his motion to dismiss, Malik states that the text message exchange is between him and Saferstein, Doc. 118 at 20, and MTCF does not dispute this in its reply brief.  *See generally* Doc. 123.

summer of 2022, the Money Tree Defendants began to repay MTCF directly, in a departure from the usual practice where the institutional buyers would repay MTCF. ¶ 85. When asked about this change, Malik told MTCF that this was because some institutional buyers did not want to deal with multiple wire transfers. ¶ 86. Between July 14 and September 23, 2022, Malik made written representations to MTCF about when certain mortgage loans were expected to be sold, all of which were then repaid directly from the Money Tree Defendants (the "Directly Repaid Loans"). ¶ 91. But MTCF claims these representations were knowingly false, as Malik knew at the time that those mortgage loans had *already* been sold. ¶ 92. MTCF also claims Malik made these representations to induce MTCF to continue to fund mortgage loans, specifically 23 outstanding[10] mortgage loans that MTCF funded between July 18 and October 5, 2022 (the "Outstanding Mortgage Loans"). ¶¶ 17, 93.

The specific misrepresentations center around emails describing loan "settlement" dates. ¶ 94. MTCF alleges that it was "well understood" between the parties that when Malik referred to a settlement date or said that a loan was settling, this meant the mortgage loan was being sold to an institutional buyer. *Id*. MTCF alleges that Malik knew that the Directly Repaid Loans were sold weeks or months earlier than what he represented to MTCF. *Id*. Specifically, Malik emailed MTCF:

- On July 14, 2022, with the subject line "Settlement Today," that this "wire[] should be out shortly for today funding thanks." ¶ 94(a).
- On July 18, 2022 with the subject line "Wednesday Settlement," that "these two loans scheduled collateral cleared and I signed funding docs this morning." ¶ 94(b).
- On August 2, 2022 with the subject line "A second loan settling today: 8/2 Settlement," that "this loan is also settling today in addition to the one sent this morning." ¶ 94(c).

---

[10] MTCF alleges that the defendants have failed to repay the principal that defendants drew against the Facility to fund the loans. ¶ 9.

- On August 10, 2022, with the subject line "Settlement," that "this weeks [*sic*] settlement, The [*sic*] loan list is attached" and that the referenced loans were "settling today." ¶ 94(d).

- On September 9, 2022, with the subject line "9/12 Settlement," that "[t]oday the above loans will settle this morning." ¶ 94(e).

- On September 15, 2022, with the subject line "Settlements," that "Chen 327K loan from May is settling this Friday." ¶ 94(f).

- On September 23, 2022, with the subject line "Settlements," that "[s]ee attached two loans settling today." ¶ 94(g).

In late October 2022, Malik informed MTCF that the Money Tree NY was halting business and would not be able to make the October 2022 interest payment. ¶ 66. MTCF claims that the Money Tree Defendants failed to pay the interest payments due in October, November, and December 2022, and January and February 2023. ¶¶ 67, 71–72. On November 9, 2022, the Money Tree Defendants terminated MTCF's access to a Box.com account containing the loan application and underwriting documents underlying every mortgage loan funded by the Facility, including the 23 Outstanding Mortgage Loans. ¶ 75.

According to MTCF, the Money Tree Defendants owe $720,374.31 in unpaid interest and have failed to repay $10,563,345.06 in principal that they drew against the Facility to finance the 23 Outstanding Mortgage Loans. ¶¶ 9, 18.

**B. Procedural Background**

MTCF commenced this action on November 28, 2022, bringing breach of contract claims against the Money Tree Defendants. Doc. 1. MTCF also brought a claim against Malik for conversion. *Id*. On November 30, 2022, MTCF filed an emergency motion for a preliminary injunction and temporary restraining order. Doc. 29. The Court denied the motion for injunctive relief. Dec. 2, 2022 Conference Tr. at 47:11–12.

On January 18, 2023, the defendants were granted leave to file a motion to dismiss. Jan. 18, 2023 Minute Entry. On February 14, 2023, the Court granted MTCF leave to file an amended complaint. Feb. 14, 2023 Conference Tr. at 9:19–21. MTCF filed the amended complaint on February 28, 2023. Doc. 112. In its amended complaint,

MTCF alleges the Money Tree Defendants breached their contract, or in the alternative, were unjustly enriched.  ¶¶ 103–120.  MTCF also brings fraudulent inducement claims against Malik.  ¶¶ 121–128.

The Money Tree Defendants filed their motion to dismiss the amended complaint on March 14, 2023, Doc. 114, and Malik filed his motion on March 15, 2023, Doc. 116.

## II.   LEGAL STANDARD

### A.  Rule 12(b)(1) Motion to Dismiss For Lack of Subject Matter Jurisdiction

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted), *aff'd*, 561 U.S. 247 (2010); *see also United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (quotation marks omitted)).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).  While the Court must accept as true all factual allegations in the complaint, *Morrison*, 547 F.3d at 170 (citation omitted), the Court may not draw any jurisdictional inferences in favor of plaintiff, *Fraser v. United States*, 490 F. Supp. 2d 302, 307 (E.D.N.Y. 2007) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).  "Jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (citing *Drakos*, 140 F.3d at 131).  Thus, in resolving a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a district court may consider evidence outside the pleadings.  *Morrison*, 547 F.3d at 170 (citing *Makarova*, 201 F.3d at 113).

### B.  Rule 12(b)(6) Motion to Dismiss For Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe*

*v. N.Y. Univ.*, 20-cv-1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).[11]

## III.   DISCUSSION

When a court is confronted by a motion raising a combination of Rule 12(b) defenses, it will decide the jurisdictional issues before considering whether the complaint states a claim.  *See Darby Trading*, 568 F. Supp. 2d at 335 (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir.1963)); *Yellow Page Sols. Inc. v. Bell Atl. Yellow Pages Co.*, 00-cv-5663 (MM), 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) (citation omitted).  Accordingly, the Court first addresses the Money Tree Defendants and Malik's arguments as to subject matter jurisdiction before turning to their 12(b)(6) arguments.

### A.  The Court Has Subject Matter Jurisdiction Over The Defendants

The defendants move to dismiss on the grounds this Court lacks subject matter jurisdiction pursuant to 28 U.S.C. § 1332.   Doc. 115 at 10–13, Doc. 118 at 9–12.  Subject matter jurisdiction based on 28 U.S.C. § 1332 requires[12] "complete diversity, i.e. all plaintiffs must be citizens of states diverse from those of all defendants."  *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 118 (2d Cir.), as amended (Nov. 12, 2014) (internal quotations omitted). Whether diversity jurisdiction exists is "determined by examining the citizenship of the parties at the time the action is

---

[11] MTCF submitted a declaration from Stein in support of its opposition to the motion to dismiss.  Doc. 124.  There is a factual dispute between the parties turning on the meaning of "settlement date."  Doc. 123 at 32; ¶ 94.  While Malik alleges that "settlement date" refers to when the Money Tree Defendants repaid MTCF, Doc. 118 at 17, MTCF alleges that settlement date refers to the date a mortgage loan was sold to an institutional buyer.  ¶ 94.  Stein's declaration provides new support for MTCF's interpretation of settlement date, including emails and wire transfer confirmations.  The declaration states that while MTCF does not believe it to be necessary, it can amend its amended complaint to add this new information.  Doc. 123 at 4–5.  Since the Court accepts all factual allegations in the amended complaint as true—including MTCF's meaning of "settlement date"—amending the amended complaint is not necessary at this time.

[12] MTCF seeks damages of at least $10 million, thus the $75,000 threshold required by 28 U.S.C. § 1332 is met.  *See* ¶ 128.

commenced." *Reynolds v. Wohl*, 332 F. Supp. 2d 653, 656 (S.D.N.Y. 2004) (emphasis in original).

     An individual's citizenship is determined by his or her domicile. *Linardos v. Fortuna*, 157 F.3d 945, 948 (2d Cir. 1998). A person's domicile is "the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Id.* (quotation marks and citation omitted). It is undisputed that Money Tree NY has New York citizenship. Consequently, the only question before the Court is the domicile of Funding's principals, Stein, Cojot, and Saferstein, at the time this action was filed on November 28, 2022. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570–71 (2004).

The Money Tree Defendants and Malik assert that complete diversity does not exist because "at least one if not all three" of Funding's principals were domiciled in New York when the action commenced. Doc. 115 at 7; Doc. 118 at 9. MTCF responds that complete diversity exists because its principals were domiciled in Connecticut and Florida when the action commenced. Doc. 123 at 13. This Court agrees with MTCF.

    *1. Stein*

Because he is asserting a change in domicile, ¶ 21, Stein bears the burden of proving that, prior to November 28, 2022, he intended to give up his old New York domicile and take up new domicile in Connecticut, "coupled with an actual acquisition of a residence" in Connecticut. *Rosa v. Charitable Trucking Co.*, 21-cv-3153 (KNF), 2021 WL 3774312, at *3 (S.D.N.Y. Aug. 24, 2021) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 243–44 (2d Cir. 1984)). Stein must prove these facts "by clear and convincing evidence." *Id.* Here, Stein meets that test. Stein provided his 2021 federal tax return, a house deed acquired in April 2022, and his driver's license issued in May 2022, all reflecting a Connecticut address. Doc. 112–2. He also submitted additional documents reflecting a clear intent to live in Connecticut. *See id.* (New York City Register Office document dated August 30, 2021, reflecting sale of Stein's

Manhattan apartment).  Stein also asserts that he "previously lived in Manhattan, but he sold his apartment there in August 2021, when he moved to Connecticut."  ¶ 21.  Hence, the Court finds that Stein was a domiciled in Connecticut at the time this action commenced.

The defendants advance two arguments as to why Stein is still domiciled in New York:  (1) he owns property on Fire Island, New York; and (2) he is a licensed attorney in New York.  Doc. 115 at 11; Doc. 118 at 10.  These arguments are unavailing.  First, a party can own and visit a residence during vacations and not be domiciled in that state.  *See New Canaan Cap. Mgmt., LLC v. Ozado Partners LLC*, 16-cv-1395 (PGG), 2017 WL 1157153, at *8 (S.D.N.Y. Mar. 25, 2017) (holding that a family that spent summer vacation and certain holidays in Virginia did not demonstrate an intent to establish Virginia as their domicile).  Stein claims that his home on Fire Island is only used during the summer and is "fully closed each year during the months of October through April." ¶ 21.  He has also provided evidence to that effect.  *See* Doc. 112–2 at 16–17 (invoice stating that the water was turned on "for the summer" on April 24, 2022 and a text message stating that the house was closed on October 21, 2022).

Second, a party's employment location is not dispositive of his or her domicile. *See Korb v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 03-cv-10333 (CSH), 2006 WL 300477, at *2 (S.D.N.Y. Feb. 7, 2006); *see also Young v. Century House Hist. Soc'y*, 117 F. Supp. 2d 277, 281 (N.D.N.Y. 2000) (finding domicile in New York where plaintiff "spent the work week at his apartment in New Jersey and then returned to his condominium in New York on weekends").  The Court also makes the entirely non-controversial observation that legions of attorneys are licensed in New York but live— *i.e.*, are domiciled— in New Jersey and Connecticut and commute to their jobs in Manhattan on a daily basis.  The defendants' arguments do not alter the Court's conclusion that Stein is domiciled in Connecticut.

2.  *Cojot*

Per the amended complaint, Cojot has lived in Florida since 2017.  ¶ 23.  Cojot has provided a 2019 driver's license, 2019 voter registration, 2021 tax return, and a March 2022 condominium deed all reflecting a Florida address.  Doc. 112–4.  The Money Tree Defendants and Malik respond that Cojot's condominium purchase in March 2022 does not demonstrate, absent other evidence, that he was domiciled in Florida.  Doc. 115 at 12; Doc. 118 at 11.  Even if that is true, Cojot's other documents provide ample support.  Next, the defendants argue Cojot is asserting a change in domicile, which requires a heightened test.  *Id*.  But this is never alleged in the amended complaint.  The Court holds Cojot was a domiciled in Florida when this action commenced.

3.  *Saferstein*

Saferstein maintains a Florida residence, but has a New York business address.  ¶ 22.  Saferstein has provided his 2018 driver's license, 2018 voter registration, 2021 tax return, and October 2022 electric bill, all reflecting a Florida address.  Doc. 112–3.  Nonetheless, the Money Tree Defendants argue it is "geographically inconsistent" for Saferstein to live in Florida but work in New York.  Doc. 115 at 12.  Even if this is true, a party's employment location does not conclusively decide their domicile.  *See Korb.*, 2006 WL 300477, at *2; *Young*, 117 F. Supp. 2d at 281.  Moreover, Saferstein's employer maintains a Florida address in addition to its New York address, resolving this purported inconsistency.

In short, the Court finds that Stein, Cojot, and Saferstein were domiciled in—and thus citizens of—states other than New York when this November 28, 2022 action began.  As such, there is complete diversity among the parties.  Accordingly, the motion to dismiss based on the failure to establish subject matter jurisdiction is denied.

**B.  Breach of Contract**

To state a claim for breach of contract a plaintiff must plead that an agreement exists.  *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020)

(citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  To determine whether an agreement exists, the Court must look "to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds."  *Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 106 (2018) (citation omitted).

Here, MTCF alleges that it entered into an oral contract with Money Tree NY and an implied-in-fact contract with Money Tree DE.  ¶¶ 7, 39–40, 60.  The Money Tree Defendants respond that no contracts existed, or alternatively that their terms were not sufficiently definite.  Doc. 115 at 16–17.  The Court finds MTCF had valid contracts with the Money Tree Defendants.

### 1. MTCF Had Oral Contract with Money Tree NY

"When not barred by the statute of frauds, [oral contracts] are just as binding as written contracts.  *Stein v. Gelfand*, 476 F. Supp. 2d 427, 431 (S.D.N.Y. 2007).  On a motion to dismiss, the Court must assume the factual allegations in the amended complaint are true.  *Morrison*, 547 F.3d at 170.  The amended complaint pleads that MTCF agreed to provide Money Tree NY with the Facility, and that the terms were "were all agreed verbally by and between [MTCF] and [Money Tree NY]."  ¶ 39.

Money Tree NY responds that the Court does not need to accept these factual allegations as true because they are contradicted by other documents in the complaint.  *See Alexander v. Bd. of Educ. of City Sch. Dist. of City of New York*, 107 F. Supp. 3d 323, 331 (S.D.N.Y. 2015), *aff'd sub nom. Alexander v. Bd. of Educ. of City of New York*, 648 F. App'x 118 (2d Cir. 2016) (quotation marks and citation omitted); Doc. 126 at 8.  Specifically, Money Tree NY relies on emails from April 7 and April 19 of 2021 and a text exchange from September 22, 2022 that purportedly demonstrate "future documentation of a future agreement and an equity investment . . . to fund application for a line of credit with another lender."  Doc. 126 at 8–9.  The Court finds that these messages contain no indication pertaining to a future agreement, and in fact use language suggesting an *existing* agreement between the parties.  *See* Doc. 112–9 (April 7, 2021

email discussing documentation requirements "in order to formalize our credit line with yourselves"); Doc. 112–6 (April 19, 2021 email stating "[a]ny loans we sell funds will go back to [Money Tree NY] as per normal"); Doc. 112–5 (September 22, 2022 text message stating "our agreement was always that you would buyback any loan over 3 months").  In the alternative, Money Tree NY claims that any contract was between MTCF's principals and Money Tree NY.  Doc. 115 at 13.  But MTCF alleges, without ambiguity, that "[a]ll amounts funded under the Facility came from [MTCF], not from [MTCF's] principals personally or from any other companies."  ¶ 50.

> 2.  *MTCF Had Implied-In-Fact Contract With Money Tree DE*

 "[A] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct."  *Shih v. Petal Card, Inc.*, 18-cv-5495 (JFK), 2020 WL 5659429, at *25 (S.D.N.Y. Sept. 23, 2020) (quoting *Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975)).  Such contracts are "just as binding as an express contract," and the law recognizes "no distinction between agreements made by words and those made by conduct."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc*., 448 F.3d 573, 582 (2d Cir. 2006).  "The terms of an implied in-fact-contract turn on the conduct of the parties." *Id.*

Money Tree DE's conduct reflects its intent to be bound by the terms of the Agreement.  The amended complaint pleads that Money Tree DE made mortgage loans using MTCF's funds, and then repaid those funds to MTCF with interest.  ¶ 60.  In doing so, Money Tree DE conducted itself in accord with the Agreement between MTCF and Money Tree NY, reflecting its intent to be similarly bound.  Though MTCF and the Money Tree Defendants agree Money Tree DE was not in existence at the time of the initial agreement, *see* ¶¶ 58, 60, Doc. 115 at 14–15, this fact does nothing to change the allegations that Money Tree DE engaged in a course of conduct sufficient to establish an implied-in-fact contract with MTCF.

*3. Definite Contract Terms Existed*

An oral or implied contract is valid when "the terms were clear and definite, and the conduct of the parties evinces mutual assent sufficiently definite to assure that the parties were truly in agreement with respect to all material terms." *Carlsen v. Rockefeller Ctr. N., Inc*., 74 A.D.3d 608, 609 (1st Dep't 2010).  Here, the Money Tree Defendants repeatedly ratified the material terms of the contract through multiple email, letter, and text communications.  Docs. 112–5 to –9.  Particularly persuasive is the September 15, 2021 letter prepared at Malik's request for Money Tree NY's accountants.  Docs. 112–7, 112–8.  The letter expressly described that MTCF provided the Facility, funded "100%" of the mortgage loans originated by Money Tree NY, and stated the 14% interest rate was "payable monthly."  Doc. 112–8.  The Money Tree Defendants endorsed MTCF's representation of the Agreement and provided it to an external party, showing mutual assent of the Agreement.  While the Money Tree Defendants are correct there was no "definitive" credit ceiling or "definitive" interest rate (which instead allegedly was "set at a rate that fluctuated over time at [MTCF's] whim and caprice"), Doc. 115 at 17, they ignore the fact these terms were defined as "subject to agreement" between the parties and did in fact only change by an alleged mutual agreement between the parties.[13]  ¶¶ 39(g), 50, 63, 64.  Their argument that there was no set time period for the Agreement is similarly unpersuasive.  Doc. 115 at 16–17.  All parties were instead free to withdraw from the Agreement at any time (so long as the Money Tree Defendants repaid the loan amounts they had already received from MTCF). In other words, the Agreement was defined as being terminable at will.  Courts regularly uphold contracts with similar terms. *See, e.g*., *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co*., 976 F.3d 239, 245 (2d Cir. 2020) (upholding contract and finding that "[u]nder New York law, it is well

---

[13] For the months of April and May 2022, MTCF "agreed" to reduce the interest rate from 14% to 12%. ¶ 64.  "[B]y way of mutual agreement" between MTCF and the Money Tree Defendants, the rate went back to 14% in June 2022.  *Id.*  The Money Tree Defendants dispute this, alleging that MTCF unilaterally decreased the rate of interest it charged.  Doc. 115 at 17.

settled that a contract of indefinite duration is terminable at will unless the contract states expressly and unequivocally that the parties intend to be perpetually bound.").

In sum, the Court finds valid contracts existed between MTCF and the Money Tree Defendants.  MTCF must next show that it adequately performed the contract, the Money Tree Defendants breached it, and that MTCF suffered damages.  *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. at 347 (S.D.N.Y. 2020) (citation omitted).  Here, MTCF provided the Facility according to the terms of the Agreement.  ¶¶ 39, 48, 51.  The Money Tree Defendants breached by (1) failing to pay monthly debt service for the months of October 2022–February 2023, and (2) failing to repay the principal to MTCF upon the sale of the 23 Outstanding Mortgage Loans or within three months of MTCF's financing of those loans.  ¶¶ 79–81, 109.  MTCF alleges that it has suffered at least $10 million in damages.  ¶ 128.  Thus, this Court finds MTCF has sufficiently plead breach of contract, and the Money Tree Defendants' motion to dismiss on that ground is denied.

### C.  Unjust Enrichment

In New York, a claim for unjust enrichment "is barred if there is a valid contract governing the subject matter of the dispute, even if one of the parties to the claim is not a party to that contract."  *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) (quotation marks and citation omitted) (collecting cases).  However, "it is still permissible to plead [unjust enrichment] claims as alternative theories."  *Singer v. Xipto Inc*., 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012); *see also ESI, Inc. v. Coastal Power Prod. Co*., 995 F. Supp. 419, 436 (S.D.N.Y. 1998) ("Should a jury decide that these contracts did not grant [plaintiff] enforceable rights against the defendants, [plaintiff] could still seek recovery on the alternative, quasi-contract theory of unjust enrichment.").  Here, MTCF pleads unjust enrichment as an alternative theory; indeed, defendants dispute the very existence of an enforceable contract.  Accordingly, the Money Tree Defendants are not entitled to dismissal on Funding's claim for unjust enrichment.

### D.  Statue of Frauds

The Money Tree Defendants argue that New York's Statue of Frauds bars both the breach of contract claim and the unjust enrichment claim.  The Court finds that MTCF's claims are not barred by the Statute of Frauds.

First, § 5-701(a)(10) of the General Obligations Law does not apply.  *See* Gen. Oblig. Law § 5-701(a)(10) (providing that an agreement must be in writing if the agreement is a "contract to pay compensation for *services rendered in negotiating* a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein[.]" (emphasis added)).  The following services fall within the scope of § 5-701(a)(10):  "performing due diligence and financial analysis . . . , seeking out and interacting with potential sources of financing, preparing presentations for potential investors, and developing a general negotiating strategy for accomplishing any proposed transactions."  *Chardan Cap. Mkts., LLC v. Nw. Biotherapeutics, Inc*., 17-cv-4727 (PKC), 2018 WL 3733948, at *4 (S.D.N.Y. Aug. 6, 2018).  Money Tree NY and DE did not provide these services to MTCF.  Instead, they conducted their own transactions using the funds borrowed from MTCF and simply repaid the loan, with interest, to MTCF upon sale.  Indeed, the purpose of § 5-701(a)(10) is to "prevent intermediaries, whose services can be performed in the course of a few and even momentary conversations, from making false or exaggerated claims regarding their fees or commissions." *Id.* at *3.  The Money Tree Defendants acted independently of MTCF, rather than as intermediaries, additionally confirming that § 5-701(a)(10) does not apply.

Second, § 5-701(a)(1) does not apply.  Section 5-701(a)(1) provides that an agreement is void if it is not in writing and "subscribed by the party to be charged therewith" when the agreement "[b]y its terms is not to be performed within one year from the making thereof[.]"  *See* Gen. Oblig. Law § 5-701(a)(1).  Contracts that can be fully performed within one year by "any possible means," including indefinite contracts, fall outside of the Statute of Frauds.  *Santos v. Medina*, 417 F. Supp. 3d 280, 288

(S.D.N.Y. 2019). "Where performance is possible, however unlikely or improbable that may be, the agreement does not come within the proscription of the statute." *Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV*, 754 F. Supp. 2d 610, 613 (S.D.N.Y. 2010) (quoting *Pace v. Perk*, 440 N.Y.S.2d 710, 718 (1981)); *see also Ohanian v. Avis Rent A Car Sys., Inc.,* 779 F.2d 101, 108 (2d Cir. 1985) ("Where either party under the contract may rightfully terminate within a year, the contract is outside the statute."). Here, the Agreement had no set term and therefore could be completed within a year—either by mutual agreement between the parties, a decision by MTCF to no longer fund the Facility, or a decision by the Money Tree Defendants to repay all outstanding loans and stop borrowing from the Facility.

Third, relying on *Foros Advisors LLC*, the Money Tree Defendants argue that there is no signed writing that satisfies the Statute of Frauds. Doc. 115 at 20. However, that case is inapposite. In *Foros Advisors LLC* the court held that for a writing to satisfy the Statute of Frauds it must "state all essential or material terms of that alleged agreement" *because* the agreement in that case was subject to §§ 5-701(a)(1) and (a)(10). *Foros Advisors LLC v. Digital Globe, Inc*, 333 F. Supp. 354, 363–64 (S.D.N.Y. 2018). For the reasons stated above, neither section applies here.

Finally, the unjust enrichment claim is not barred by the Statute of Frauds. These claims are not barred when a plaintiff merely seeks to recover for the value of the work performed, as distinct from the contract price. *Grappo v. Alitalia Linee Aeree Italiane, S.P.A.*, 56 F.3d 427, 433 (2d Cir. 1995) (internal quotations omitted); *see also Castellotti v. Free*, 138 A.D.3d 198, 208 (1st Dep't 2016) ("This theory of unjust enrichment is not precluded by the statute of frauds because it is not an attempt to enforce the oral contract but instead seeks to recover the amount by which [defendant] was enriched at [plaintiff's] expense."). Here, MTCF seeks to recover the approximate $10 million in loans it extended to defendants, rather than interest or damages it could pursue under breach of

contract.  ¶ 115.  Accordingly, MTCF's breach of contract and unjust enrichment claim are not barred by the Statute of Frauds.

### E.  Fraudulent Inducement

MTCF brings a fraudulent inducement claim against Malik.  To state a claim for fraudulent inducement under New York law, a plaintiff must allege that "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss."  *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), as amended (June 13, 2012) (summary order) (internal quotation marks and citation omitted).  In addition, "the [c]omplaint must . . . state with particularity the circumstances of the fraud under Rule 9(b) and contain sufficient facts, accepted as true, to state claims for relief for common-law fraud that are facially plausible under Rule 8(a)(2)."  *Woori Bank v. RBS Sec., Inc.*, 910 F. Supp. 2d 697, 700–01 (S.D.N.Y. 2012).  MTCF alleges that Malik made material misrepresentations to MTCF and its principals about whether and when the mortgage loans were sold to the institutional buyers.  ¶ 122.  These representations were false and were made to deceive MTCF.  ¶¶ 123–24.  MTCF believed and relied on these misrepresentations to continue providing loans under the Facility, ¶¶ 125–26, and as a result suffered financial loss—namely the value of the 23 Outstanding Mortgage Loans.  ¶ 128.

In response, Malik first argues MTCF does not plead fraudulent inducement with the required specificity.  Doc 118. at 12–13.  Under Rule 9(b), a complaint must specify the fraudulent statements, the speaker, where and when the statements were made, and explain why the statements were fraudulent.  *DiMuro v. Clinique Laboratories, LLC*, 572 Fed. Appx. 27, 30 (2d Cir. 2014) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170,

1175 (2d Cir.1993)).  MTCF has satisfied this test.  The amended complaint specifies that
Malik made fraudulent statements in seven emails he sent MCTF between July 14 and
September 23, 2022 that state certain mortgage loans would be sold in the future, despite
knowing these loans had already been sold. ¶ 91–92.  While MTCF pleads these claims
"upon information and belief," this is allowed when "the facts underlying the fraud are
peculiarly within the possession and control of the defendant" *Arista Records, LLC v.
Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Here, the details of the fraud are likely only
within the Money Tree Defendants' possession and control because MTCF's access to the
Box.com account with particular loan information has been terminated. ¶ 75.

 Second, Malik argues that his representations regarding repaid mortgage loans
were true.  Doc. 118 at 14–17.  This dispute turns on the meaning of "settlement date" in
the July 14 to September 23, 2022 emails between the parties.  Doc. 123 at 32; ¶ 94.
While Malik alleges that "settlement date" refers to when the Money Tree Defendants
repaid MTCF, Doc. 118 at 17, MTCF alleges that settlement date referred to the date a
mortgage loan was sold to an institutional buyer.  ¶ 94.  However, accepting all factual
allegations in the amended complaint as true—including the meaning of "settlement
date"—and drawing all reasonable inferences in MTCF's favor, the Court finds that the
amended complaint sufficiently pleads that Malik made material misstatements.

 Third, Malik claims his misstatements were not material because MTCF was
eventually repaid for the loans.  Doc. 118 at 17.  This argument is of no moment.  MTCF
asserts a claim alleging that Malik, in his series of emails between July 14, 2022 and
September 23, 2022, made misrepresentations about *when* the mortgage loans were sold
to institutional buyers in order to induce MTCF to continue to finance mortgage loans,
not a claim for nonpayment.  ¶¶ 94–100.  *See Frontier–Kemper Constructors, Inc. v.
American Rock Salt Co*., 224 F. Supp. 2d 520, 528 (W.D.N.Y. 2002) ("With regard to
misstatements of present fact, the New York courts and the courts in this Circuit generally
agree that actions for fraudulent inducement are not barred[.]").

Fourth, Malik argues the amended complaint does not sufficiently allege scienter. Doc. 118 at 18–19.  To establish scienter, "conclusory assertions of intent are sufficient if supported by facts giving rise to a strong inference of fraudulent intent."  *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 579 (2d Cir. 2005) (per curiam).  A strong inference of fraudulent intent can be asserted by alleging facts that show that the defendant had both the "motive and opportunity" to commit the alleged fraud. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).  In order to raise a strong inference of scienter through motive and opportunity, MTCF must allege that Malik "benefitted in some concrete and personal way from the purported fraud."  *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010) (citation omitted).

Here, MTCF sufficiently pleads scienter through motive and opportunity. According to MTCF, Malik's motivation to commit the fraud was "to induce [MTCF] to continue to allow draws under the Facility" at a time when mortgage rates were increasing and there was a "cool down" in the market.  ¶ 61.  Malik benefitted from the alleged fraud because MTCF continued to lend him money when it would have otherwise stopped.  ¶ 100.  Malik also had ample opportunity, because he was the principal of the Money Tree Defendants and the date of sale of the Mortgage Loans was self-reported. Accordingly, the Court finds that the amended complaint adequately pleads scienter because it alleges facts that give rise to a strong inference of fraudulent intent.

Fifth, Malik argues that MTCF does not plead justifiable reliance because (1) MTCF was provided all the data it needed to make a reasonable inquiry and (2) MTCF had a duty to inquire, yet failed to do so.  "Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it."  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).  Assessing the reasonableness of a party's reliance is "intensely fact-specific and generally considered inappropriate for

determination on a motion to dismiss." *Stamelman v. Fleishman-Hillard, Inc.*, 02-cv-8318 (SAS), 2003 WL 21782645, at *7 (S.D.N.Y. July 31, 2003).  However, evaluating whether a party has "adequately *pleaded* justifiable reliance can be a proper subject for a motion to dismiss."  *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999) (emphasis added).  Here, the Court finds that MTCF has adequately pleaded justifiable reliance.  *See* ¶¶ 125–26.  MTCF specifically alleges that had it known the truth about when mortgage loans were being resold, it would not have continued to fund the mortgage loans, and would thus not have financed the 23 Outstanding Mortgage Loans. ¶ 126.

Finally, Malik argues that the fraudulent inducement claim is duplicative of MTCF's breach of contract claim.  Malik's argument fails because the fraudulent inducement claim was brought against Malik and the breach of contract claim was only brought against the Money Tree Defendants.  *See Sun Prod. Corp.*, 507 F. App'x 46, 48 (2d Cir. 2013) ("[A] fraud claim may be dismissed *as duplicative* only as against a defendant against whom the related contract claim is viable.") (quoting *Richbell Info. Servs. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 589 (1st Dep't 2003)) (emphasis in original).

Thus, the Court finds that the amended complaint has adequately plead fraudulent inducement, and Malik's motion to dismiss on this ground fails.

## IV.    CONCLUSION

For the foregoing reasons, the Money Tree Defendants' motion to dismiss is DENIED, and Malik's motion to dismiss is DENIED.  MTCF's request for oral argument is DENIED as moot.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 114, 116 and 125.  The parties are directed to appear for a telephonic conference on November 30, 2023 at 2:00 pm.  The parties are directed to dial 877-411-9748 and enter access code 3029857# when prompted.

It is SO ORDERED.

Dated:   November 9, 2023
         New York, New York

_____

EDGARDO RAMOS, U.S.D.J.