UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MONEY TREE CAPITAL FUNDING, LLC

          *Plaintiff,*

   – *against* –

MONEY TREE CAPITAL MARKETS LLC, *a New York limited liability company*, MONEY TREE CAPITAL MARKETS LLC, *a Delaware limited liability company*, and KAMAL MALIK,

          *Defendants.*

---

MONEY TREE CAPITAL MARKETS LLC, *a New York limited liability company*, MONEY TREE CAPITAL MARKETS LLC, *a Delaware limited liability company*, and KAMAL MALIK

          *Counter- and Third-Party Plaintiffs,*

   – *against* –

MONEY TREE CAPITAL FUNDING, LLC,

          *Counter-Defendant,*

    *and*

KEITH STEIN, IRA SAFERSTEIN, OLIVIER COJOT, TITAN CAPITAL LLC *and* ELLINGTON MANAGEMENT GROUP,

          *Third-Party Defendants.*

**OPINION AND ORDER**

22-cv-10084 (ER)

---

RAMOS, D.J.:

     Money Tree Capital Funding, LLC ("MTCF") initially brought this action against Money Tree Capital Markets LLC, a New York limited liability company ("Money Tree NY"), and Money Tree Capital Markets LLC, a Delaware limited liability company

("Money Tree DE," and collectively the "Money Tree Defendants") for breach of contract, or in the alternative, for unjust enrichment, and against Kamal Malik for fraudulent inducement (together with the Money Tree Defendants, "Defendants").  Doc. 112.  Defendants then asserted counterclaims against MTCF for breach of contract, fraud, and tortious inference.  Doc. 131.  They also asserted third-party claims against Keith Stein, Ira Saferstein, and Olivier Cojot for fraud and misappropriation, as well as a claim against Saferstein alone for breach of fiduciary duty.  *Id.*  Defendants also asserted third-party claims against Titan Capital LLC ("Titan") for breach of contract, fraud, negligence, and negligent misrepresentation.[1]  *Id.*

Before the Court is a motion by MTCF, Stein, Saferstein, Cojot, and Titan (collectively, the "Movants") to dismiss the Defendants' counterclaims and third-party complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1), and failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.  Factual Background[2]

*1.  The Parties*

MTCF is a New York limited liability company with three members:  Keith Stein, Ira Saferstein, and Oliver Cojot.  ¶ 162.  Stein is allegedly domiciled in Connecticut, and Saferstein and Cojot are allegedly domiciled in Florida.  ¶¶ 163–165.  Titan is a Delaware limited liability company that has a New York office located in Manhattan.  ¶ 166.  Saferstein is Titan's co-owner and managing member.  ¶175; Doc. 131-2.  Cojot is the founder and vice chairman emeritus of Ellington.  ¶ 176; Doc. 131-3.

---

[1]  These claims were also brought against third-party defendant Ellington Management Group ("Ellington"). The Defendants have since voluntarily dismissed Ellington from this action.  *See* Doc. 172.

[2]  Unless otherwise noted, citations to "¶ _" refer to the third-party complaint and counterclaims, Doc. 131.

Malik is a citizen of the United Kingdom, a permanent resident in the United States, and is domiciled in Virginia. ¶ 161. He is a principal of the Money Tree Defendants. Money Tree NY is a New York limited liability company, with Malik as its sole member. ¶ 159. Money Tree DE is a Delaware limited liability company also with Malik as its sole member. ¶ 160.

### 2. *The Alleged Investment*

On October 24, 2019, Malik created Money Tree NY for the purpose of making mortgage loans to home buyers and then reselling these mortgage loans to institutional investors. ¶ 171. At that time, the members of Money Tree NY were Malik and Eastone Equities, LLC ("Eastone"), an entity affiliated with Anthony Lee.[3] *Id.* Lee allegedly brought in two major financial institutions, Titan and Ellington, to invest in Money Tree NY. ¶¶ 172, 182.

Titan and Ellington were represented by Saferstein and Cojot, as well as Stein, an attorney who allegedly purported to represent both firms. ¶¶ 150, 166–67, 172, 174–76. Based on Saferstein and Cojot's alleged representations and alleged use of their Titan and Ellington emails and office phones in their communications, Malik claims he believed that Saferstein and Cojot were interested in working with Money Tree NY as representatives of their companies rather than in their personal capacities. ¶¶ 181–182.

In February 2020, Saferstein allegedly demanded that Money Tree NY amend its operating agreement so that Saferstein would become a manager of the company. ¶ 183. Saferstein, Malik, and Eastone proceeded to execute this amendment. ¶ 183; *see also* Doc. 131-5 (amended operating agreement). [4] Saferstein then allegedly opened an account for Money Tree NY at Signature Bank. ¶¶ 185–186. On March 6, 2020,

---

[3] Lee was Malik's business partner in Money Tree NY. ¶ 171. In April 2022, Malik alleges that he discovered Lee had "taken actions in his individual capacity that concerned" him, and that he subsequently asked Lee to leave Money Tree NY. ¶ 238. Lee agreed to leave the business. ¶ 239.

[4] The Court can properly consider documents that are attached to the third-party complaint. *See Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)

Saferstein deposited $30 million into the Signature account.  ¶ 186; Doc. 131-1.
Defendants allege, upon information and belief, that the $30 million was provided by
Titan and Ellington as an equity investment in Money Tree NY, and that Saferstein and
Cojot told Malik that the source of the funds was from Titan and Ellington.  ¶¶ 187, 195,
198.

Defendants allege that Money Tree NY, Titan, and Ellington agreed that Titan and
Ellington would receive 14% of the proceeds from the sale of each mortgage loan as an
"advance/distribution," while the rest of the net proceeds from each sale would go into a
separate account for Money Tree NY at Chase Bank to cover operations.  ¶ 211.
According to the third-party complaint, once Money Tree NY secured a warehouse line
of credit[5] from a third-party lender, Titan and Ellington would return the
advance/distributions.  *Id.*

Thus, Defendants allege that, in July 2020, this $30 million equity investment was
used to fund Money Tree NY's origination of its first three loans, and Titan and Ellington
"further agreed to continue to invest and fund" the operations of Money Tree NY.  ¶¶ 194,
196–97.

3. *Creation of MTCF*

At the same time, in mid-July 2020, Stein, Saferstein, and Cojot informed Money
Tree NY that Titan and Ellington would be using a new entity in their business
relationship.  ¶ 216.  On July 31, 2020, Stein, Saferstein, and Cojot created MTCF.
¶ 217.  During the same time, Cojot and Malik exchanged emails in which Cojot
requested time to speak with Malik about a warehouse line of credit for the business.  ¶
192; Doc. 131-6.

According to Defendants, on July, 31, 2020 Stein, Saferstein, and Cojot told
Malik that "all funds would come from and should be sent to a new [b]ank [a]ccount at

---

[5] A warehouse line of credit is extended to an entity that makes mortgage loans.

Signature Bank" in MTCF's name.  ¶ 218.  Upon information and belief, Defendants allege that the $30 million in invested funds were taken from Money Tree NY's bank account at Signature Bank and sent to MTCF's bank account at the same bank.  ¶ 219.  This transfer was allegedly made "without consideration" and without "authority or approval" from Defendants.  ¶¶ 219–20.

     4.   *Saferstein's Alleged Distributions*

From 2021 to 2022, Saferstein purportedly demanded that the Money Tree Defendants pay him "distributions," which Money Tree Defendants paid—though only under duress for fear that Saferstein would no longer release funds for the Money Tree Defendants to operate their business.[6]  ¶¶ 228–29; Doc. 131-13.  Saferstein and Cojot allegedly also demanded that Money Tree NY make "similar distributions" to MTCF, which Money Tree NY did.  ¶¶ 230–231.  Saferstein allegedly demanded that the Money Tree Defendants purchase "bad loans" that Titan was trying to remove from its balance sheet before he would authorize the funding for other loan closings.  ¶¶ 234–37.

On October 20, 2022, Stein allegedly drafted a letter to Malik and his then-business partner, Anthony Lee, to sign and send to the accountants of the Money Tree Defendants.  ¶ 221; Doc. 131-12.  The letter stated, in relevant part:

> This letter is to acknowledge, confirm and certify that [MTCF], has since 2019 provided a funding facility (the "Funding Facility") to [the Money Tree Defendants].  MTCF and [the Money Tree Defendants] are unaffiliated entities.  Under the terms and conditions of the Funding Facility, MTCF has funded 100% of the principal amount of certain residential mortgage loans originated and closed by [the Money Tree Defendants].  MTCF is paid an annual 14% rate of interest, payable monthly, on the Funding Facility, that is calculated on the amount available under the Funding Facility.

---

[6]  Money Tree DE was created on April 26, 2022, in order to "facilitate Lee and Eastone's exit from any involvement" with the Money Tree Defendants.  ¶¶ 238–242.

Doc. 131-12. The Defendants allege that the letter falsely "represented that [MTCF] was an affiliate" of the Money Tree Defendants,[7] ¶¶ 221–223, but that Malik agreed to the letter because it did not alter the agreement between the Money Tree Defendants, on the one hand, and Titan and Ellington, on the other. ¶ 227.

  5.  *Breakdown of the Business Relationship Between the Parties*

During the spring of 2022, changing market conditions negatively affected the Money Tree Defendants' business model. ¶ 244. Despite experiencing financial losses, the Defendants allege they continued to pay Saferstein and MTCF their distributions in anticipation that these funds would be returned once they finalized finding a new warehouse line of credit, "as was always the arrangement." ¶ 245.

Later in 2022, Malik allegedly sought a new warehouse line for the Money Tree Defendants and asked Titan and Ellington to "refund the payments and distributions . . . as per their oral investment agreement."[8] ¶ 246. Saferstein then allegedly threatened Malik with legal action and FBI investigations. ¶ 247.

In October 2022, Malik and Money Tree DE initiated negotiations with Nomura, a financial services group, for approval of a warehouse line of credit. ¶ 249. But Nomura terminated the negotiations shortly after this lawsuit was filed on November 28, 2022.[9] ¶¶ 250–252. The Defendants assert, on information and belief, that the termination occurred because Stein, Saferstein, and Cojot communicated with Nomura and interfered with Money Tree DE's application. ¶ 251.[10]

---

[7] As Movants point out, contrary to Defendants' allegations, the text of the letter clearly states that the entities were "unaffiliated." Where, as here, the text of a document contradicts the allegations in the third-party complaint, the text of the document controls. *See Maury v. Ventura in Manhattan, Inc.*, 544 F. Supp. 3d 396, 400 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).

[8] The third-party complaint appears to be referring to the alleged agreement between the parties that once Money Tree NY secured a warehouse line of credit from a third-party lender, Titan and Ellington would return the advance/distributions. *See* ¶ 211.

[9] The third-party complaint incorrectly states that the lawsuit was initiated on November 30, 2022. ¶ 250.

[10] The Court notes, without considering the allegations contained therein, that the first amended complaint filed by MTCF against the Defendants presents a starkly different set of facts concerning the same

## B. Procedural Background

MTCF commenced this action on November 28, 2022, asserting breach of contract claims against the Money Tree Defendants. Doc. 1. MTCF also asserted a conversion claim against Malik. *Id.* On January 18, 2023, Defendants were granted leave to file a motion to dismiss. Jan. 18, 2023 Minute Entry. On February 14, 2023, the Court granted MTCF leave to file an amended complaint. Feb. 14, 2023 Conference Tr. at 9:19–21. MTCF filed the amended complaint on February 28, 2023. Doc. 112. In its amended complaint, MTCF alleged the Money Tree Defendants breached their contract, or in the alternative, were unjustly enriched. ¶¶ 103–120. MTCF also brought fraudulent inducement claims against Malik. ¶¶ 121–128. The Money Tree Defendants filed their motion to dismiss the amended complaint on March 14, 2023, Doc. 114, and Malik filed his motion to dismiss on March 15, 2023, Doc. 116. On November 9, 2023, the Court denied the Money Tree Defendants and Malik's motions. Doc. 127.

On November 29, 2023, the Defendants answered the amended complaint. Doc. 131. They also asserted third-party claims against Titan and Ellington for: (1) breach of an alleged investment contract; (2) fraud; and (3) negligence and negligent misrepresentation. ¶¶ 272–285, 293–297. The Defendants also asserted third-party claims against Stein, Saferstein, and Cojot, for: (1) fraud and (2) misappropriation of the alleged $30 million "investment." ¶¶ 286–92, 307–13. They also asserted a claim against Saferstein for breach of fiduciary duty. ¶¶ 298–306. Finally, the Defendants also asserted counterclaims against MTCF for: (1) breach of a purported investment contract (plead in

---

transactions. Specifically, it alleges that during the summer of 2020, Malik approached Stein, Saferstein, and Cojot in their personal capacities about financing Money Tree NY, and that MTCF ultimately agreed to provide a warehouse line of credit to the Money Tree Defendants under certain conditions. Doc. 112 ¶ 38. These conditions included providing MTCF information about each mortgage loan transaction, repayment of the principal amount borrowed within three months or upon sale of each loan to an institutional buyer, and paying MTCF monthly interest payments at an annual rate of 14%. *Id.* ¶ 39. In other words, according to MTCF, neither it nor Stein, Saferstein, or Cojot intended to invest in the Money Tree Defendants, but rather to provide loans to fund the mortgages. According to MTCF, the Money Tree Defendants owe $720,374.31 in unpaid interest and have failed to repay $10,563,345.06 in principal. *Id.* ¶¶ 9, 18.

the alternative to the claims against Titan and Ellington); (2) breach of a loan agreement (also plead in the alternative); (3) fraud; and (4) tortious interference with prospective business relations.  ¶¶ 314–42.

On January 31, 2024, the Movants filed the instant motion to dismiss the counterclaims and third-party claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and also requested oral argument.  Docs. 167, 170.  The Movants generally argue that Defendants fail to plead their fraud claims with particularity, that their claims fail on the merits, and that Malik and Money Tree DE lack standing to bring a breach of fiduciary duty claim against Saferstein.  *See* Doc. 168.  On February 16, 2024, Malik and the Money Tree Defendants moved to voluntarily dismiss Ellington from this action, which the Court granted on February 21, 2024.  Doc. 172.

## II.    LEGAL STANDARDS

### A.  Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction Due to Standing

A court must dismiss the case for lack of subject matter jurisdiction if it "lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).  The party asserting subject matter jurisdiction bears the burden of establishing that jurisdiction exists by a preponderance of the evidence.  *Morrison v. Nat'l Australia Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008).  The court accepts all material factual allegations in the complaint as true, *id.*, but it does not presume the truthfulness of the complaint's jurisdictional allegations, *Frisone v. Pepsico, Inc*., 369 F. Supp. 2d 464, 469–70 (S.D.N.Y. 2005).

When a party moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), a court must consider the Rule 12(b)(1) motion first.  *Baldessarre v. Monroe-Woodbury Central. School Dist.*, 820 F. Supp. 2d 490, 499 (S.D.N.Y. 2011).  That is because "disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of

jurisdiction." *Chambers v. Wright*, No. 05-cv-9915 (WHP), 2007 WL 4462181, at *2 (S.D.N.Y. Dec. 19, 2007) (citation omitted).

### B.  Rule 12(b)(6) Motion to Dismiss For Failure to State a Claim

The applicable standard for a motion to dismiss a claim pursuant to Rule 12(b)(6) "applies equally to a counterclaim defendant's motion to dismiss a counterclaim, and to a third-party defendant's motion to dismiss a third-party complaint." *Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130, 139 (S.D.N.Y. 2018); *see Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp. 2d 620, 622 (S.D.N.Y. 2008)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to

support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

## III.    DISCUSSION

### A.    Breach of Fiduciary Duty Claim Against Saferstein

The Defendants allege that Saferstein breached his fiduciary duty to Malik and the Money Tree Defendants through, among other forms of alleged misconduct, demanding distributions and forcing the Money Tree Defendants to purchase "bad loans." Doc. 174 at 32. The Movants argue that Malik and Money Tree DE lack standing to bring this claim, and that, as asserted by Money Tree NY, the claim fails on the merits because it is not supported by the factual allegations. Doc. 168 at 39–41. Because standing is a jurisdictional issue, the Court will consider this argument first.[11]

### *1.    Standing*

Movants argue that Malik lacks standing to bring a direct claim of fiduciary duty against Saferstein, as the alleged breaches were all "against [Money Tree NY], not Malik individually." Doc 168 at 39. Furthermore, they argue that Money Tree DE also lacks standing, because Malik and the Money Tree Defendants never allege Saferstein was a

---

[11] Movants raise this contractual standing argument under Rule 12(b)(1), which Defendants do not contest. It is unclear whether Rule 12(b)(1) is the correct procedural vehicle for this challenge. *See, e.g., Toretto v. Donnelley Financial Solutions, Inc.*, 523 F. Supp. 3d 464, 476 (S.D.N.Y. 2021) ("[B]y challenging the sufficiency of the allegations to plead a cause of action for breach of contract in the context of a Rule 12(b)(1) challenge to Plaintiffs' standing, Defendants again tempt the Court to conflate a merits inquiry with standing."); *Buffalo Xerographix, Inc. v. Hartford Insurance Group*, 540 F. Supp. 3d 382, 390 (W.D.N.Y. 2021) ("Although a motion under Rule 12(b)(1) is the proper mechanism to challenge Article III standing, the Second Circuit has made clear that a challenge to contractual standing—a party's right to relief for breach of contract—implicates the merits of the claim rather than a court's subject-matter jurisdiction.") (citing *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210–12 (2d Cir. 2020))). In any event, as explained below, Defendants' argument as to Malik and Money Tree DE fails regardless of whether Rule 12(b)(1) or Rule 12(b)(6) applies.

manager of Money Tree DE.[12]  *Id.* at 40.  In response, the Defendants argue that
Saferstein, owed a duty of care and loyalty to "[the Money Tree Defendants] and Malik,
who was an investor" due to his position as manager.  Doc. 174 at 32.

Generally, a corporate officer or director "owes a fiduciary duty only to the
corporation over which he exercises management authority, and any breach of fiduciary
duty claims arising out of injuries to the corporation in most cases may only be brought
by the corporation itself or derivatively on its behalf."  *Bank of America Corp. v.
Lemgruber*, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005).  However, such direct claims can
be brought when they allege a "separate duty" to an equity interest holder.  *Id; see also
Qantel Corp. v. Niemuller*, 771 F. Supp. 1361, 1367 (S.D.N.Y. 1991) (plaintiff could
bring breach of fiduciary duty claim against president of its indirect subsidiary resulting
from decline in value of indirect subsidiary's stock where defendant president also owed
separate fiduciary duty to plaintiff).

Saferstein was the manager of Money Tree NY.  ¶ 299 ("Saferstein assumed the
role of Manager of [Money Tree New York] on or about February 2020"); *see also* Doc.
131-5 (amended operating agreement).  "[I]n the absence of a contrary provision in the
LLC agreement, the manager of an LLC owes the traditional fiduciary duties of loyalty
and care to the members of the LLC."  *DirecTV Latin America, LLC v. Park 610, LLC*,
691 F. Supp. 2d 405, 439 (S.D.N.Y. 2010).  Accordingly, he owed a fiduciary duty to
Malik, who was a member of the LLC, separate and apart from the duty he owed to
Money Tree NY.  Therefore, Malik does have standing to bring a claim against Saferstein
for breach of this fiduciary duty.  *DirecTV*, 691 F. Supp. 2d at 439.  However, because
Malik and the Money Tree Defendants never allege that Saferstein was the manager of
Money Tree DE, the Court concludes he did not owe a fiduciary duty to that company.

---

[12]  The parties do not contest Money Tree NY's standing.

In sum, the Court finds that Malik and Money Tree NY have standing to bring a breach of fiduciary claim against Saferstein, while Money Tree DE does not.

### 2.   Merits of the Breach of Fiduciary Duty Claim

To state a claim for breach of fiduciary duty under New York law, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26, 36 (S.D.N.Y. 2021) (internal quotation marks and citation omitted). A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Intellivision v. Microsoft Corp.*, 784 F. Supp. 2d 356, 372 (S.D.N.Y. 2011) (quoting *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005)).

As described above, the manager of an LLC owes fiduciary duties of loyalty and care to the LLC's members. *DirecTV Latin America*, 691 F. Supp. 2d at 439. Here, the third-party complaint alleges that Saferstein was the manager of Money Tree NY. ¶ 183. Accordingly, the Court finds that the Defendants have adequately pled that Saferstein owed a fiduciary duty to Money Tree NY and Malik. The first element is therefore satisfied.

As to the second element, Defendants assert that Saferstein engaged in various kinds of misconduct, including allegedly "creating [MTCF], which directly competed with [the Money Tree Defendants]" "demanding and taking payments from [the Money Tree Defendants]," forcing them to take "bad loans from Titan to help Titan," and "denying [them] use of the $30 million Titan and Ellington invested." Doc. 174 at 32.

Some of these allegations do not plausibly allege misconduct. As explained in more detail below, the third-party complaint contains no factual allegations indicating MTCF was engaged in the loan origination or resale business or that Saferstein was competing with or diverting business away from Money Tree NY. Moreover, there are no

allegations in the third-party complaint that Saferstein actually denied Money Tree NY use of the alleged $30 million investment.  Accordingly, these allegations do not support the Defendants' arguments.

However, the remainder of the allegations do plausibly allege misconduct.  The third-party complaint expressly states "Saferstein demanded [the Money Tree Defendants] pay him monies he described as distributions," ¶ 228, and that "Saferstein also demanded that [Money Tree NY] purchase bad loans that Titan was trying to remove from its balance sheet."  ¶ 234.

Movants raise various factual objections to these claims, namely that the Defendants wrongly interpret the documents on which the allegations are based.  Doc. 168 at 39.  Specifically, Movants claim that the spreadsheet listing the distributions paid directly to Saferstein, which Defendants attach to their pleadings, says that these were distributions "Paid for Eastone Equities," which they interpret to mean they were distributions to Eastone, not Saferstein.  Doc. 168 at 41.  Likewise, they claim that "the text exchange on which [D]efendants rely for their allegations that Saferstein forced [Defendants] to 'purchase bad loans' …. refers to refinances rather than loan sales."  *Id.* *See* Doc. 131-13 at 2 (text from Saferstein to Malik:  "I made commitments to my partner that this loan was going to refi last week.").

However, the Movants' objections are of no moment.  Although a close call, the documents here do not expressly contradict the allegations in the complaint.  *Cf. Maury*, 544 F. Supp. 3d at 400.  Rather, the Movants ask the Court to interpret the meaning of "Paid for Eastone Equities" and "refi" in the communications between the parties.  At this stage in the litigation, the court does not weigh evidence or resolve factual disputes. *Halebian*, 644 F.3d at 130; *see also Nielsen*, 746 F.3d at 62.  Based on the allegations in the third-party complaint, the Court finds that the second element is met.

The final element of a breach of fiduciary duty claim is also met.  The third-party complaint alleges that both Malik and Money Tree NY incurred financial damages as a

result of Saferstein's misconduct.  ¶¶ 253–257.  Thus, the motion to dismiss the breach of fiduciary duty claim against Saferstein is denied.

### B.  Fraud Claims

Defendants assert that each of the Movants committed fraud by making material misrepresentations and omissions of material facts.  They allege that Stein, Saferstein, and Cojot falsely claimed that they were authorized to invest in the Money Tree Defendants on Titan and Ellington's behalf, when in fact, Stein, Saferstein, and Cojot were acting in their personal capacities.  Doc. 174 at 12–13.  They also allege that the Movants used the Money Tree Defendants' "own money to fund transactions" and also "demanded payments and transfers."[13]  *Id.* at 12.  The Movants argue that Defendants fail to plead their fraud claims with the particularity mandated by Rule 9(b) and allege that Defendants fail to allege the elements of a fraud claim.  Doc. 168 at 23–27.  Each argument is addressed in turn.

#### 1.  Rule 9(b) Particularity

Beyond the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity.  *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago. v. JP Morgan Chase Co*., 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 319–20 (2007)).  Specifically, Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *DiMuro*

---

[13]  In their fraud claims, Defendants allege that MTCF and its members falsely held out Titan and Ellington as business partners when the companies were not involved in the transaction between the parties.  However, Defendants also assert negligence, negligent misrepresentation, and breach of contract claims against Titan based on its involvement.  Both of these claims cannot be true.  Defendants appear to clarify that these claims are pled in the alternative, stating "Either Titan (or Ellington) were a party to the fraud, breach of contract, etc., or [Stein, Saferstein, and Cojot] misrepresented their relationship with Titan and Ellington as part of their own fraudulent scheme."  Doc. 174 at 21 n.3.

*v. Clinique Laboratories, LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (quoting *Mills v. Polar Molecular Corp*., 12 F.3d 1170, 1175 (2d Cir.1993)).  Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *See U.S. ex rel. Kester v. Novartis Pharm. Corp*., 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014).

Rule 9(b)'s heightened particularity requirement does not apply to allegations regarding fraudulent intent, also known as scienter, which may be alleged generally. Plaintiffs, however, "are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012) (quoting *Wexner v. First Manhattan Co*., 902 F.2d 169, 172 (2d Cir.1990)).  "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Loreley Financing (Jersey) No. 3. Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007)).  Plaintiffs may assert a strong inference of fraudulent intent by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A*., 459 F.3d 273, 290–91 (2d Cir. 2006) (citation omitted*); see also, e.g*., *Ho v. Duoyuan Global Water, Inc*., 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012).

In the instant case, the Defendants allege generally that Stein, Saferstein, and Cojot "misrepresented" that Titan and Ellington were their business partners, or falsely represented that they were acting on behalf of those companies.  *See* Doc. 174 at 11. However, the allegations in the third-party complaint fail to cite to any purportedly fraudulent statements actually made, the speaker of those statements, and where and when the statement was made.  All of those details are required under Rule 9(b). Alleging the general subject matter of the purported misrepresentations is insufficient.

*See First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (dismissing for lack of particularity allegations that defendant "made affirmative misrepresentations' indicating that they would 'fully cooperate' with and 'support' Plaintiff's pursuit of a buyer.").

In their opposition, the Defendants insert a multi-page chart to demonstrate that their pleadings do, in fact, meet the Rule 9(b) requirements. *See* Doc. 174 at 12–14 (chart with columns describing the fraudulent statement, speaker, "where/when" "why fraudulent," and "[c]ites"). Each item in the chart purports to find support in specific paragraphs of the complaint or in specific exhibits, but a review of each citation reveals the elements required by Rule 9(b) are still missing. For example, Stein, Saferstein and Cojot allegedly told Defendants they were representatives of Titan and Ellington over text, email, and telephone from "February 2020 onwards." *Id.* at 12. However, nowhere in the third-party complaint, or in any of the attached exhibits, do Defendants describe a specific text, email or phone call on a particular date where Stein, Saferstein, or Cojot represented that they were acting as the agents of Titan or Ellington.

Next, Defendants claim that Movants misrepresented that the source of the funding was MTCF, when it actually came from the $30 million alleged equity investment placed in Money Tree NY's Signature Bank account, and allegedly withdrawn from the account by Saferstein. Doc. 174 at 17 (citing to ¶¶ 253–71).[14] However, none of the allegations in the third-party complaint indicate the speaker, or where or when the statements were made. Accordingly, these allegations also fail to plead fraud with particularity as required by Rule 9(b). The chart also describes that, from "March 2020

---

[14] Defendants do not argue that the October 20, 2022 letter misrepresented that the source of their funding was MTCF. Instead, they claim that the letter "inaccurately stated that the Money Tree Defendants had in place a 'funding facility' with [MTCF]." Doc. 174 at 14. The only dispute between the parties regarding the October 20, 2022 letter is how it presented the relationship between them. Defendants allege that the letter fraudulently claimed that MTCF "was an affiliate" of the Money Tree Defendants, when, in fact, they were not affiliates. ¶ 221. However, as noted earlier, the text of the letter directly contradicts Defendants' claim.

onwards," MTCF "misrepresented … that it was funding loan transactions when, in fact, [MTCF] was using the original monies Titan and Ellington invested in [MTCF]." *Id.* at 13. To support this claim, the chart only references allegations in the third-amended complaint. However, none of the citations to the third-party complaint listed in the chart present a specific communication on a particular date where Stein, Saferstein, or Cojot made a representation that MTCF was funding loan transactions. *See* ¶¶ 154; 185–88;190; 256–57. Put in other words, none of the Defendants' arguments provide "the who, what, when, where and how of the alleged fraud." *See U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F.Supp.3d 242, 252 (S.D.N.Y. 2014).

Accordingly, the Court finds that the Defendants do not plead their fraud allegations with the particularity required by Rule 9(b) and the claims can be dismissed on this basis alone.

### 2. *Merits of the Fraud Claims*

Defendants also do not succeed on the merits of their fraud claims, providing an independent reason for dismissal. To state a claim of common law fraud under New York law, a plaintiff must allege that the defendant made "(1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Financial Guaranty Insurance Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015).

While Defendants argue that that they relied on the alleged misrepresentations and were injured, Doc. 174 at 18–19, the allegations in the third-party complaint make only conclusory allegations of reliance. As the Movants point out, Defendants do not, for example, allege that they would have found a different investor had they known they were not dealing with Titan and Ellington. Doc. 168 at 26. "A statement cannot be fraudulent if it did not affect an investment decision of the plaintiff." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Defendants merely recite, in a

conclusory manner, that they relied on the Movants' misstatements.  ¶¶ 286–292, 331–337.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a plausible claim for relief.  *Huer Huang v. Shanghai City Corp*., 459 F. Supp. 3d 580, 585 (S.D.N.Y. 2020) (quoting *Iqbal*, 556 U.S. at 678).  Accordingly, the Court finds that the third-party complaint does not sufficiently allege a fraud claim on the merits.

Therefore, Defendants' fraud claims against Titan, Stein, Saferstein, and Cojot are dismissed.

### C. Negligence and Negligence Misrepresentation Claims

Next, Defendants assert negligence and negligent misrepresentation claims against Titan.  ¶¶ 293–297.  The Movants argue the Defendants fail to plead the required elements of these claims, and additionally that the negligent misrepresentation claim does not meet the heightened pleading standard of Rule 9(b).  Doc. 168 at 27–29.  The Defendants retort that they do adequately plead their claims.  Doc. 174 at 21.

*1.  Negligence Claim Against Titan*

A negligence claim under New York law requires (1) a "cognizable duty of care"; (2) breach of that duty; and (3) damages as a proximate result of that breach.  *Stagl v. Delta Airlines, Inc*., 52 F.3d 463, 467 (2d Cir. 1995).  New York courts evaluate the duty of care by balancing multiple factors, including "the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."  *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001) (citation omitted).  The question of the existence and scope of a defendant's duty is a legal issue for the court to resolve.  *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000).  In the absence of a duty of care, "no liability can ensue."  *Id.*

Defendants argue that Titan "negligently omitted to inform" them that Saferstein was not authorized to act on Titan's behalf, by allegedly "permitting Saferstein . . . to communicate . . . with his Titan email address and phone numbers" or, in the alternative, by negligently misrepresenting that Saferstein "acted with its knowledge and authority and was authorized to conduct business" on its behalf. Doc. 174 at 22. However, as the Movants point out, Defendants also allege that Titan was not involved in the transaction between the parties. Doc. 168 at 28. Both of these allegations cannot be true.

Even if the negligence claim is plead in the alternative, the third-party complaint does not sufficiently allege that Titan owed a duty of care to Malik and the Money Tree Defendants. Defendants argue that "as equity partners in [MTCF], Titan owed [Defendants] a duty of care." Doc. 174 at 21. However, the third-party complaint does not allege that Titan was an equity partner. In fact, the third-party complaint merely states, upon information and belief, the "$30 million came from Titan and Ellington as an equity investment." ¶ 187. There are no allegations of any partnership agreement or further contracts between Titan and the Movants.

To the extent that Defendants argue that Titan, through its agent Saferstein, "made certain representations … that induced the agreement," Doc. 174 at 21, this allegation is purely conclusory. The third-party complaint only states that Stein, Saferstein, and Cojot "told Malik they were representatives of Titan and Ellington." ¶ 149. It also states that since Saferstein and Cojot were founders and principals of their respective firms, "it appeared reasonable that they would be authorized" to act on their behalf. ¶ 174. There are no allegations that plausibly establish that Titan authorized such representations, such that it would create a duty of care between the company and Defendants.

Thus, because Defendants do not plausibly establish that Titan owed them a duty of care, the motion to dismiss the negligence claim against Titan is granted.

*2. Negligent Misrepresentation Claim Against Titan*

To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (internal quotation marks and citations omitted).

"Under the 'duty' element, 'New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.'" *Anschutz Corp.*, 690 F.3d at 114 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)).  To establish such a privity-like relationship under New York law, a plaintiff must plead:  "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Prudential Insurance Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 321–22 (N.Y. 1992) (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985)); *see also JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401 (S.D.N.Y. 2004).

As explained above, Defendants fail to allege that Titan owed it any duty, much less a duty based on a relationship so close as to approach privity of contract.  At best, Defendants' claim is that Titan negligently failed to alert them that Saferstein and MTCF were acting as independent entities.  However, this kind of arms-length business transaction falls well below the high standard required to establish a privity-like

relationship. *See Prudential*, 605 N.E.2d at 321–22. The negligent misrepresentation claim against Titan is therefore dismissed.

### D. Misappropriation Claim

The Defendants allege Stein, Saferstein, and Cojot misappropriated the alleged $30 million investment by improperly denying Defendants access to these funds. Doc. 174 at 23. The Movants argue that Defendants fail to allege facts sufficient to state a claim for misappropriation and that that it is duplicative of their breach of investment contract claim. Doc. 168 at 29–31.

Under New York law, an unfair competition claim may be based either on "palming off"[15] or on misappropriation. *Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 208–09 (S.D.N.Y. 2014). Misappropriation, the theory alleged here, "concerns the taking and use of a plaintiff's property to compete against plaintiff's own use of the same property." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 477 (2007) (citations omitted). A claim for unfair competition by misappropriation can be broken down into two elements: Defendants must show that Movants "(1) misappropriated [their] labors, skills, expenditures, or good will; and (2) displayed some element of bad faith in doing so." *Sidney Frank Importing Co.*, 998 F. Supp. 2d at 209.

As a threshold matter, "misappropriation claims relate to improper commercial competition and unfairly appropriating "the skill, expenditures and labors of a competitor." *American Lecithin Co. v. Rebmann*, No. 12-cv-929 (VSB), 2017 WL 4402535, at *23 (S.D.N.Y. Sept. 30, 2017). Here, there is no allegation that Stein, Saferstein, Cojot or MTCF were commercial competitors in the loan origination and resale business.

As to the question of what constitutes skills, expenditure, and labor, misappropriation claims generally involve commercial rivals attempting to undercut each

---

[15] "Palming off" is the sale of the goods of one manufacturer as those of another. *Sidney Frank Importing Co.*, 998 F. Supp. 2d at 208–09.

other to gain an economic advantage. *See, e.g.*, *Sidney Frank Importing Co.*, 998 F. Supp. 2d at 210 (finding misappropriation of plaintiff's labors and expenditures when a rival whiskey company purchased from a distillery whiskey that had been distilled to plaintiff's precise specifications, produced under its direction, and for which plaintiff incurred considerable expenses). This case presents a more unusual claim: Defendants allege that Stein, Saferstein, and Cojot "essentially stole" the $30 million investment from Money Tree NY's bank account by improperly transferring it to MTCF's account. Doc. 174 at 23.

The Court finds *American Lecithin Company v. Rebmann* instructive on whether the alleged theft of the investment constitutes misappropriation of labors, skills, or expenditures. *Rebmann*, 2017 WL 4402535. There, a son argued that his father misappropriated his shares of stock in a certain company and the funds he received as an inheritance from his mother. *Id.* at *23. The court found that while the son claimed that his personal property was "misappropriated," he failed to allege "any improper competition or how the taking amounts to an appropriation of [his] skill, expenditure or labors." *Id.* Here, the alleged investment given to Defendants is akin to the shares of stock and inheritance given to the son in *Rebmann*. Like in *Rebmann*, Defendants do not allege that Movants were their commercial competition and do not explain how the alleged misappropriation of the $30 million investment amounts to a taking of their skill, expenditure, or labor. At most, Defendants argue that their personal property was unlawfully converted, which is insufficient to sustain a misappropriation claim.

Accordingly, the Court grants the motion to dismiss the misappropriation claim.[16]

### E.  Tortious Interference Claim Against MTCF

Defendants also asserts a tortious interference claim against MTCF. ¶¶ 338–342. Specifically, Defendants allege that MTCF, through its members, Stein, Saferstein, and

---

[16]  Because the Court dismisses the misappropriation claim on the merits, it does not address whether the claim is duplicative of the breach of contract claim.

Cojot, in bad faith, convinced Nomura to reject the Money Tree Defendants' application for a warehouse line of credit.  Doc. 174 at 33.

To state a claim for tortious interference under New York law, a plaintiff must allege (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (internal quotation marks and citations omitted).  The third element — that is, the "wrongful purpose" element—sets a "high bar":  "[A] claim for tortious interference with business relations requires a plaintiff to show, as a general rule, that the defendant's conduct amounted to a crime or an independent tort." *Id.* (internal quotation marks and alterations omitted).  The only exception recognized by New York courts to this general rule is "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs"—in other words, where a defendant acts with malice. *Id.* (internal quotation marks omitted); *accord Amaranth, LLC v. J.P. Morgan Chase & Co.,* 71 A.D.3d 40, 888 N.Y.S.2d 489, 494 (1st Dep't 2009) (explaining same).

Here, Defendants only allege, on information and belief, that Stein, Saferstein, and Cojot communicated with Nomura and "interfered" with the Money Tree Defendants' application.  ¶ 131.  While they argue that the "obvious inference" is that the MTCF members "in bad faith, convinced Nomura to stop pursuing the agreement," Doc. 174 at 26, this claim is not supported by facts in the third-party complaint.  Thus, the Defendants have not alleged that MTCF, through its members, committed a crime or independent tort, nor that MTCF acted only to inflict intentional harm. *16 Casa Duse, LLC*, 791 F.3d at 247.  Because the third required element is not met, the Court grants the motion to dismiss the tortious interference claim.

### F. Breach of Contract Claims

The Defendants assert claims against Titan and MTCF for breach of contract. ¶¶ 272–278; 314–330. The Defendants argue that they adequately allege breach of an investment contract, or in the alternative, a loan agreement, Doc. 174 at 27–31, while the Movants argue that these claims fail on the merits, due in part to the fact Defendants never show that a breach actually occurred. Doc. 168 at 33–39.

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the [party bringing the claim], (3) breach of contract by the [other party], and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citations omitted). "When pleading these elements, a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) (citing *Levy v. Bessemer Trust Co., N.A.*, No. 97-cv-1785, 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)).

Here, the Defendants allege that MTCF and Titan agreed to fund Money Tree NY's operations through a $30 million equity investment until Money Tree NY secured a warehouse line of credit from a third-party lender. ¶ 202. In exchange, MTCF and Titan would "take back 14% of the proceeds of the sale of each mortgage as an advance/distribution," while Money Tree NY would keep the remainder to cover operational costs. ¶ 211. Once Money Tree NY secured a lender, the parties allegedly agreed that MTCF and Titan would return the advance/distributions. *Id.* While Money Tree NY allegedly performed by paying these advances/distributions, ¶¶ 228–33, 245, MTCF and Titan allegedly breached by "failing to fund [Money Tree NY's] operations and failing to return the advance[s]/distributions," Doc. 174 at 28; *see also* ¶¶ 211, 246–27, 256, and damaging the company as a result.

But the third-party complaint does not raise any allegations that MTCF ever actually denied Money Tree NY funding for mortgages.[17] There is no dispute that all of the funding for the mortgage loans came from MTCF. And critically, under the terms of the alleged investment agreement, MTCF was not required to return the "advances/distributions" until Money Tree NY secured a lender for the warehouse line of credit. As the Defendants concede, negotiations with Nomura ultimately failed. ¶¶ 250–252. Accordingly, MTCF cannot have breached an agreement by failing to comply with a term before it was contractually required to.

Because Malik and Money Tree DE do not sufficiently allege breach, neither of their breach of contract theories (of an investment agreement, or in the alternative, a loan agreement) can proceed. Accordingly, Defendants' breach of contract claim is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Movants' motion to dismiss the third-party complaint and counterclaims is GRANTED in part and DENIED in part. All claims are dismissed, with the exception of Malik and Money Tree NY's claim for breach of fiduciary duty against Saferstein. The parties are directed to appear via telephone for a status conference on October 22, 2024 at 11:00 am. The parties are instructed to call (877) 411-9748 and enter access code 3029857# when prompted. The Clerk of Court is respectfully directed to terminate the motions, Docs. 167 and 170.

It is SO ORDERED.

Dated:     September 26, 2024
           New York, New York

_____
            EDGARDO RAMOS, U.S.D.J.

---

[17] Specifically, Defendants claim that Movants "denied [them] access and use of those $30 million in funds, as [Stein, Saferstein, and Cojot] took it for their own benefit, and then [they] turned around and demanded distributions." Doc. 174 at 23. However, the third-party complaint never alleges a specific instance where Movants ever denied funding.